Robert B. DAVIS, Appellant,

v.

GULF OIL CORPORATION, Appellee.

Nos. 83–938, 83–1545.

District of Columbia Court of Appeals.

Argued May 15, 1984.

Decided Dec. 10, 1984.

Anthony M. Rachal, III, Washington, D.C., for appellant.

James Bruce Davis, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

Appellant, Robert Davis, challenges two separate orders of the Landlord and Tenant Branch of Superior Court.

In the first, Judge Doyle granted summary judgment to appellee, Gulf Oil Corp. (Gulf), on Gulf's action for possession of an automotive retail service station which Davis had leased and operated since 1972. The court rejected appellant's arguments that Gulf's nonrenewal of Davis' franchise violated the 90-day notice requirement of the federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–41 (1982), and the 90-day notice and one-year minimum lease provisions of the District of Columbia Retail Service Station Act (RSSA), D.C.Code §§ 10–201 to –242 (1981). Davis has drawn this court's attention to an issue of fact that is yet to be resolved: whether Gulf acted in good faith in obtaining Davis' assent to a three-month extension of the parties' lease—an extension that Davis alleges was necessary for compliance with the statutory notice requirements. Although Gulf's alleged bad faith, if proved, conceivably could have served as a basis for a damage or rescission action under the RSSA one-year minimum lease provision, we conclude that this contested issue is not material to Davis' statutory defenses to Gulf's action for possession. Accordingly, summary judgment for Gulf must be affirmed.

Second, Davis contends that Judge Graae erred in releasing to Gulf rental payments which Davis had deposited into the registry of the court, pursuant to court order, during the four-month pendency of Gulf's action for possession. We are not persuaded by Davis' argument that, because Gulf refused to deliver gasoline to Davis' service station during this period, Davis should not be held responsible for rent after the extended lease had expired. We affirm Judge Graae's order.

I. FACTS AND PROCEEDINGS

In 1972, Davis and Gulf entered into a franchise agreement whereby Gulf leased to Davis a service station and equipment at 1301 Kenilworth Avenue, N.E., and agreed to sell Davis gasoline and other automotive products for resale to the public. This agreement consisted of several documents, including a service station lease, a contract

for the sale of gasoline and other commodities, a contract governing the delivery and storage of gasoline, and a Gulf Travel Card agreement.

Davis and Gulf renewed their franchise agreement several times after 1972. The most recent full-term agreement took effect on January 1, 1980, and extended the parties' relationship to December 31, 1982. The rent Davis paid during the course of this three-year period varied from year to year. The annual rent during 1980 was "not less than $14,400 nor more than $19,080," with the exact rent figure determined by the amount of gasoline which Davis purchased from Gulf. During 1981, the annual rent was set at "not less than $16,200 nor more than $19,080," with the exact amount of the rent again determined by the amount of Davis' gasoline purchases. Finally, in 1982, the annual rent was fixed at $19,080, with no variation in the rent based on the volume of Davis' gasoline purchases.[1]

On December 3, 1982, Davis and Gulf entered into a ten-week extension of the existing service station lease. The parties agreed to continue their franchise relationship under the terms of the 1980–82 lease from January 1, 1983 to March 10, 1983, with rent to be paid at the level fixed for 1982. At about this same time, in a letter dated December 3, 1982, Gulf provided Davis with written notice that it had "determined in good faith and in the ordinary course of business to sell the premises at 1301 Kenilworth Avenue, N.E." Gulf informed Davis that his franchise would not be renewed and that Gulf would cease dealing with Davis after March 10, 1983. Gulf also offered to sell the service station to Davis for $175,000.

During the three-month period after the mailing of this nonrenewal notice, Gulf continued to supply Davis with gasoline pursuant to the lease extension agreement. The parties also engaged in negotiations concerning the sale of the service station to Davis, with Gulf ultimately offering to sell the station and its equipment for $140,000. Although Gulf drafted and forwarded to Davis a proposed agreement of sale embodying the $140,000 asking price, Davis never executed this document.

On March 10, 1983, despite the expiration of the lease extension, Davis refused to comply with Gulf's request that he vacate the service station premises. Gulf stopped making deliveries of gasoline and, on March 29, 1983, filed a complaint with the Landlord and Tenant Branch of Superior Court seeking possession of the premises. Gulf also persuaded the trial court to grant a protective order directing Davis to deposit $1,500 into the court registry each month as a means of protecting Gulf's right to rental payments during the pendency of the action.

Alleging there was no dispute as to any material fact, Gulf filed a motion for summary judgment. In this motion, Gulf stated that it had acted in good faith both in arranging for the ten-week extension of the service station lease and in deciding to sell the station. Gulf claimed that the purpose behind the decision to execute the ten-week lease extension was to allow the parties time to negotiate a sale of the station to Davis. It further claimed that "Davis was fully informed of the purpose of the extension." In light of these facts, Gulf argued that its nonrenewal notification of December 3, 1982—delivered approximately 97 days before expiration of the ten-week lease extension—satisfied the 90-day notice requirement contained in PMPA, and thus effectively terminated Da-

---

1. The formula for determining when and how rent was to be collected remained the same for all three years of this contract. The service station lease required Davis to pay 2.5 cents in rent to Gulf for each gallon of gasoline delivered to the station. If, however, at the end of any month, Davis had not made payments during the month equal to one-twelfth the specified annual minimum rent, the lease required Davis to make up the deficiency within ten days. Thus, in any given month, Davis had to pay Gulf at least one-twelfth of the minimum annual rent.

vis' right to possession of the service station as of March 10, 1983.

In his opposition to the motion for summary judgment, Davis disputed several of Gulf's factual representations. Davis alleged that, before December 3, 1983, Gulf had led him to believe it was planning to renew his franchise agreement for another three-year term. He further claimed that Gulf did not inform him of its decision to cancel his franchise and sell the station until after execution of the ten-week lease extension. Indeed, Davis argued that the only reason he agreed to enter into the ten-week lease extension was because he "believed its purpose to be that of allowing Gulf to prepare the necessary documents for another three-year Davis franchise." Gulf's motivation for entering into the lease extension, he contended, was simply to postpone expiration of the lease so that the nonrenewal of Davis' franchise would ostensibly comply with the notice requirements of PMPA and RSSA.

Davis urged that a trial was necessary to determine whether Gulf had in fact fraudulently induced Davis to assent to the lease extension. He reasoned that, if a jury were to determine that Gulf had acted fraudulently, the lease extension would properly be declared void and, consequently, the last valid lease would have expired on December 31, 1982. Under such a view of the facts, Davis argued, Gulf's nonrenewal of the franchise violated PMPA and RSSA, providing Davis with a valid defense to an action for possession.

On August 9, 1983, Judge Doyle, in a carefully reasoned opinion and order, rejected Davis' PMPA and RSSA defenses and granted Gulf's motion for summary judgment on the possession action. Judge Doyle did not find it necessary, however, to address let alone resolve the factual issue raised by Davis, *i.e.*, whether Gulf acted fraudulently in obtaining Davis' assent to

the lease extension. On December 23, 1983, Judge Graae held a hearing, after which he released to Gulf the $6,000 in rent that Davis had paid into the registry of the court during the pendency of the possession action. Davis appealed each of these rulings to this court.

## II. Judge Doyle's Order Granting Summary Judgment To Gulf

■ Summary judgment is appropriate only when the pleadings and other materials before the trial court demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct.Civ.R. 56(c); *see McCoy v. Quadrangle Development Corp.*, 470 A.2d 1256, 1258 (D.C.1983). In reviewing on appeal the propriety of a summary judgment, this court must determine whether there is any unresolved issue of fact relevant to the ruling and also whether the trial court correctly applied the substantive law. *Sullivan v. Heritage Foundation*, 399 A.2d 856, 859 (D.C.1979). In carrying out that task, we must view the record in the light most favorable to the party who opposes summary judgment and thus resolve any doubt as to the existence of a factual dispute against the moving party. *Swann v. Waldman*, 465 A.2d 844, 846 (D.C.1983).

### A. *Davis' PMPA Defense*

In 1978, Congress enacted PMPA in an effort to protect automotive service station franchisees "from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 874. Congress concluded that federal regulation was necessary because of the typical "disparity of bargaining power" between franchisors and franchisees in the petroleum industry, S.Rep. No. 731, *supra*, at 17,[2] and because of the

---

**2.** By imposing on franchisors and franchisees certain rights and obligations concerning the termination or nonrenewal of their franchise relationships, Congress sought to remedy three

interrelated types of problems arising from the "disparity of bargaining power" enjoyed by franchisors. First, PMPA limits a franchisor's ability to force undesirable contract terms upon a

need "[t]o provide certainty and uniformity in franchise relationships which permeate a nationwide motor fuel distribution and marketing network." *Id.* at 16, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 874. Although the principal motivation underlying PMPA was to protect the interests of service station franchisees, Congress clearly intended the Act to "strike a balance between the at times conflicting interests of the parties to the relationship." *Id.* at 15, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 874. Accordingly, in addition to considering the interests of service station franchisees in not having their businesses arbitrarily terminated, Congress declared it "[p]articularly important" to recognize the significance "of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Id.* at 19, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 877; *see, e.g., Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1120 (D.Conn.1980) (PMPA "legislative history reflects a sensitivity to the legitimate needs of both the franchisees and the franchisors").

PMPA provides two types of protection to franchisees. First, it prohibits a franchisor from terminating a franchise during the course of the parties' agreement, or from nonrenewing a franchise at the conclusion of such an agreement, unless the franchisor's decision is based upon a ground enumerated in the statute. 15 U.S.C. § 2802(b)(1)(B) (1982). Second, the Act requires a franchisor to provide the franchisee with notice of a decision to terminate or nonrenew the franchise, *id.* at § 2802(b)(1)(A), and it sets forth standards governing the content and timing of the required notification. *Id.* at § 2804.

On appeal, Davis does not argue that Gulf based its decision to cancel his franchise on improper grounds. Nor does he contend that the content of Gulf's notice was inadequate. Instead, he maintains that if the parties' ten-week lease extension is properly voidable as induced by fraud—a premise which we must accept for purposes of this appeal—then Gulf's notification of nonrenewal on December 3, 1982 was untimely and could not serve to nonrenew the last valid lease, which expired on December 31, 1982.

Davis' argument relies on PMPA § 104(a)(2), which provides that, except in certain limited circumstances not relevant here, notification of nonrenewal must be furnished "not less than 90 days prior to the date on which such termination or nonrenewal takes effect." 15 U.S.C. § 2804(a)(2) (1982). Davis reads this provision to require that notification of nonrenewal be delivered 90 days before the date on which a franchise agreement expires. Thus, according to Davis, Gulf's December 3 notification of nonrenewal was ineffective under § 2804(a)(2) because it was received less than 90 days before December 31, 1982.

In its brief, Gulf argues that Davis has misinterpreted § 2804(a)(2). Gulf contends that this provision requires only that notice be given 90 days before the date on which the franchisee is required to forfeit possession of the premises. Under this interpretation, Gulf argues that Davis' allegations of fraud "are immaterial, because the ef-

---

franchisee during "negotiations leading to execution of the franchise agreement," by preventing the franchisor from "capitaliz[ing] on his disparity of bargaining power to obtain great flexibility with respect to his rights to terminate the contractual relationship." S.REP. No. 731, supra, at 17–18, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 876. Second, by affording the franchisee some protection from "the prospect of nonrenewal," which "hangs over the relationship and may manifest itself during the franchise term as a means by which the franchisor may compel the franchisee to comply with the franchisor's marketing policies," PMPA safeguards "the independence of the franchisee as a competitive influence in the marketplace." *Id.* at 18, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 877. Finally, the termination and nonrenewal provisions of PMPA serve to protect the "reasonable expectations of the parties to a motor fuel franchise ... that the relationship will be a continuing one." *Id. See Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982).

fectiveness of Gulf's notice of nonrenewal" under PMPA "is totally independent of the extension of the lease."

We therefore must determine whether a notice of nonrenewal, delivered less than 90 days before the expiration of the franchise agreement, but more than 90 days before the franchisor sought to retake possession, complies with PMPA.

The few courts which have considered this issue are divided in their interpretation of PMPA. Several courts expressly have held that § 2804(a)(2) "requires that notice be given 90 days before the date on which termination is to 'take effect,' not 90 days before the expiration date listed in the franchise agreement." *Day Enterprises, Inc. v. Crown Central Petroleum Corp.,* 529 F.Supp. 1291, 1299 (D.Md.1982); *accord Ferriola v. Gulf Oil Corp.,* 496 F.Supp. 158, 161 (E.D.Pa.1980), *aff'd mem.,* 649 F.2d 859 (3d Cir.1981); *Kesselman v. Gulf Oil Corp.,* 479 F.Supp. 800, 803 (E.D. Pa.1979), *aff'd mem.,* 624 F.2d 1090 (3d Cir.1980); *see Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1219, 1225–26 (7th Cir.1983) (approving, without discussion of timeliness, nonrenewal notice furnished after expiration of the parties' written franchise agreement, but more than 90 days before franchisor demanded possession). Other courts have held that, for a notice of nonrenewal to be effective, the franchisee must receive it at least 90 days before the date on which the franchise agreement expires. *Lasko v.*

*Consumers Petroleum of Connecticut, Inc.,* 547 F.Supp. 211, 220–21 (D.Conn. 1981); *Frankard v. Amoco Oil Co.,* 116 Wis.2d 254, 265, 342 N.W.2d 247, 252 (Wis. Ct.App.1983); *see Clark v. Mobil Oil Corp.,* 1981–1 Trade Cas. (CCH) ¶ 63,903, at 75,694 (E.D.Mo.1980) (dictum).[3]

■ For the reasons discussed below, we adopt the courts' interpretation of § 2804(a)(2) in the first group of cases: *Day Enterprises, Ferriola,* and *Kesselman.*

In interpreting PMPA, our " 'starting point' must be the language of the statute itself." *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d 5, 7 (2d Cir.) (quoting *Lewis v. United States,* 445 U.S. 55, 56, 60, 100 S.Ct. 915, 916, 918, 63 L.Ed.2d 198 (1980)), *cert. denied,* 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982); *see Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc). On its face, § 2804(a)(2) requires only that notice be furnished at least 90 days before the date on which "nonrenewal *takes effect.*" 15 U.S.C. § 2804(a)(2) (1982) (emphasis added). These words, "construed according to their ordinary sense," *Peoples Drug Stores,* 470 A.2d at 753 (citations omitted), appear to refer to the date after which the franchisee no longer is authorized by the franchisor to conduct business. *See Day Enterprises,* 529 F.Supp. at 1299; *Ferriola,* 496 F.Supp. at 161.[4] Therefore,

---

**3.** Davis' brief relies on *Blankenship v. Atlantic-Richfield Co.,* 478 F.Supp. 1016 (D.Or.1979), for the proposition that "the notice provision [of the PMPA] would have required notice to be given 90 days prior to December 31, 1982." We do not read *Blankenship* to support Davis' position. In *Blankenship,* the franchisor sent notice of its intent not to renew the franchise agreement less than 90 days before the agreement was due to expire. In contrast with the facts now before the court, however, the notice did not inform the franchisee that he could retain possession beyond the expiration date of the agreement so as to provide 90 days between the date of the notice and the date that the franchisee had to abandon the premises. Thus, the notice in *Blankenship* not only fell within the last 90 days of the franchise agreement but also failed to provide the franchisee 90 days in which to ar-

range for the winding-up or relocation of its business. It was untimely under either of the interpretations of § 2804(a)(2) discussed in the text. Accordingly, although *Blankenship* holds that the remedy for a violation of § 2804(a)(2) is renewal of the franchise relationship, and not merely a court-ordered 90-day extension of the agreement, the *Blankenship* court could have relied on either of the two interpretations of the statute considered here in concluding that a § 2804(a)(2) violation had occurred.

**4.** This interpretation of § 2804(a)(2) is supported by the manner in which these same words are used elsewhere in § 2804. Section 2804(c)(3)(B) states that a franchisor's nonrenewal notice must specify "the date on which ... nonrenewal takes effect." If, as Davis suggests, the date on which "nonrenewal takes ef-

regardless of when the franchise agreement is scheduled to expire, it would defy the common meaning of the words to say that nonrenewal has taken effect as long as the franchisor willingly permits the franchisee to maintain possession of the premises and continues to supply the franchisee with gasoline pursuant to the agreement.

Moreover, the legislative history of PMPA simply states that "[t]he notification requirements of the legislation mandate 90 days advance notice of termination or nonrenewal of a franchise in most cases." S.REP. No. 731, *supra*, at 15, U.S.CODE CONG. & ADMIN.NEWS 1978, p. 874. Although this statement adds little to the plain wording of the Act, it does support the logical inference that the purpose behind § 2804(a)(2) is to provide franchisees with a reasonable period of time in which to make arrangements to dissolve or relocate their businesses. This purpose of providing the franchisee with a 90-day winding-up period will be accomplished equally well whether the notice is required to be furnished 90 days before the franchise agreement expires or 90 days before the franchisor requests possession.[5]

Furthermore, there is nothing in the legislative history to suggest that the purpose of § 2804(a)(2) was to roll back and rigidly fix the date by which the franchisor must either exercise the right to nonrenew the franchise or be deemed to have agreed to a complete renewal of the existing agreement. Indeed, such a construction of the statute would impede the negotiations of parties who wished to renew their franchise relationship:

[T]he franchisor would be placed in a position of giving notice of intent to terminate at the same time it was negotiating terms for a renewal of the franchise agreement, to protect itself in the event that negotiations failed .... [T]he franchisee would then be negotiating "under the gun".... Clearly a more reasonable construction is that if negotiations fail, the franchisee must be given at least ninety days notice in order to make whatever arrangements are necessary to cease doing business as a franchisee, regardless of when the agreement expired.

*Ferriola,* 496 F.Supp. at 161. Any attempt to read § 2804(a)(2) to establish an unnecessarily rigid cutoff date after which the franchisor forfeits any right to nonrenew the franchise runs counter to PMPA's general policy of permitting the franchisor maximal flexibility in conducting its marketing activities, consistent with those interests of the franchisee which the Act attempts to protect. *See* S.REP. No. 731, *supra,* at 17–19.

■ In summary, because we read PMPA to require only that notification of nonrenewal precede by 90 days the franchisor's termination of performance and demand for possession, Gulf's December 3, 1982 notification was timely. Davis received it more than 90 days before nonrenewal was to take effect on March 10, 1983. This is true irrespective of whether the ten-week lease extension was valid. Accordingly, Davis' allegations of fraud could not possibly serve as the basis of a successful PMPA defense to Gulf's action for possession.

fect" is always identical to the date on which the parties' franchise agreement expires, it would be unnecessary to require the franchisor to include written notice of this date within the notification of nonrenewal. Thus, § 2804(c)(3)(B) strongly suggests that a franchisor may set the date on which "nonrenewal takes effect" as some date other than the expiration date on the franchise agreement.

5. While the interpretation of § 2804(a) that we adopt makes it possible for a franchisor flatly to refuse to negotiate or agree to a renewal of a

franchise agreement at the end of a term and thereby effectively to leave the franchisee continually subject to termination with 90 days notice (when based upon one of the grounds for nonrenewal specified in 15 U.S.C. § 2802(b)), this does not appear to offend any of PMPA's underlying principles or purposes. The PMPA does not require a franchise agreement to be of any minimum duration. As discussed later, however, such an arrangement may, under some circumstances, be found to run afoul of the District of Columbia RSSA.

### B. *Davis' RSSA Defenses*

Davis also argues that Gulf's actions violated two provisions of the District of Columbia RSSA. Gulf's response to this argument is that, to the extent the RSSA in any way purports to interfere with Gulf's nonrenewal of the franchise and repossession of the premises, RSSA (enacted one and one-half years before the PMPA) is preempted by PMPA, 15 U.S.C. § 2806(a) (1982). Although we do not find the PMPA preemption analysis to be as facile as Gulf suggests, we nonetheless conclude that RSSA, as a matter of law, does not provide Davis with a cognizable defense to this action.

#### 1.

■ In determining the extent to which PMPA preempts RSSA, our focus is on Congress' intent. "Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983) (citations omitted). Thus, we must consider the preemptive effect of both the explicit and implicit manifestations of congressional intent reflected in PMPA. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 540–41, 97 S.Ct. 1305, 1317, 51 L.Ed.2d 604 (1977). Preemption will be inferred either when Congress has implicitly indicated an intent to occupy an entire field of regulation, in which case all local law in the field will be preempted, *e.g.*, *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982), or when local law actually conflicts with federal law, in which case the local law will be preempted to the extent it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Jones*, 430 U.S. at 526, 97 S.Ct. at 1310 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

PMPA contains a provision which explicitly addresses the Act's preemptive effect.

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a) (1982).[6]

Looking first at this statutory language, we note the limited nature of the preemption which this section prescribes. Preemption is required only to the extent that PMPA "applies to the termination, ... the nonrenewal, ... or the furnishing of notification with respect" to these two practices. Similarly, PMPA preempts local laws only "with respect to termination, ... nonrenewal, ... or the furnishing of notification with respect thereto."[7]

---

**6.** The District of Columbia is treated as a "State" for purposes of PMPA. 15 U.S.C. § 2801(19) (1982).

**7.** This language is to be contrasted with that contained in preemption provisions such as the one included by Congress in the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1144(a) (1982). In drafting ERISA, Congress originally considered "a limited preemption clause, applicable only to state laws relating to the specific subjects covered by ERISA." *Shaw*, 103 S.Ct. at 2900–01. This initial, "limited," ERISA preemption provision was similar to PMPA § 2806(a). *See id.* 103 S.Ct. at 2900–01 n. 18. The Conference Committee acting on ERISA, however, rejected the proposed preemption clause as too narrow and substituted a provision which preempts "any and all State laws insofar as they ... relate to any employee benefit plan," 29 U.S.C. § 1144(a), re-

■ We read this language to be an explicit statement of Congress' intent to "occupy the entire field" of franchise termination and nonrenewal, without displacing local law which governs other matters related to service station franchises. Accordingly, § 2806(a)'s scope is limited to "preempt[ing] state law in the subject areas in which the federal legislation deals." S.Rep. No. 731, *supra*, at 16, U.S.Code Cong. & Admin.News 1978, p. 874. "To the extent that the provisions of [PMPA] do not apply to an aspect of the franchise relationship, State laws dealing with such aspects of the relationship are not preempted .... The preemption provisions of the legislation are limited to provisions of State law dealing with termination or nonrenewal of franchise relationships." *Id.* at 42, U.S. Code Cong. & Admin.News 1978, p. 900.

It follows that PMPA § 2806(a) preempts only those provisions of RSSA which ad-dress termination, nonrenewal, or the notice required with respect to these practices. Any RSSA provision that regulates some other aspect of a franchise relationship is preempted—under the doctrine of implied preemption—only insofar as it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives," *Jones*, 430 U.S. at 540–41, 97 S.Ct. at 1317, of PMPA. To the extent that such a provision does not interfere with PMPA's intended purpose of establishing a "uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees," S.Rep. No. 731, *supra*, at 19, U.S.Code Cong. & Admin.News 1978, p. 877, it will not be preempted, even if it has some incidental effect on a franchisor's obligations in cancelling a franchise.[8]

gardless of whether such local laws address specific subject areas covered by ERISA. *Id.* 103 S.Ct. at 2900–01 & n. 19 & n. 20.

**8.** *See, e.g., Hanes v. Mid-America Petroleum, Inc.,* 577 F.Supp. 637, 644–45 (W.D.Mo.1983) ("While the PMPA adds a layer of rights and obligations upon the franchise relationship, it was not intended to totally displace State law principles which do not specifically apply to the termination or nonrenewal of the franchise"); *cf. Shaw,* 103 S.Ct. at 2901–02 n. 21 (construing even the extremely broad preemptive language in ERISA, *see supra* note 7, as permitting continued application of state laws which "affect" ERISA plans, but only in a "tenuous, remote, or peripheral" manner).

The legislative history of PMPA contains an example of a type of local law that is not intended to be preempted, but which nonetheless may have an incidental impact on a franchisor's rights and obligations in carrying out a termination or nonrenewal. PMPA § 2804(b)(1) authorizes franchisors to terminate or nonrenew a franchise with less than 90-days notice, "[i]n circumstances in which it would not be reasonable for the franchisor to furnish notification" 90 days in advance. 15 U.S.C. § 2804(b)(1) (1982). When a franchisor attempts to accomplish such a short-notice termination or nonrenewal, however, the Act prohibits the establishment of a new franchise with respect to the premises until at least 30 days after notice is given and the termination or nonrenewal takes effect. *Id.* at § 2804(b)(1)(B)(i). This provision is intended to give the affected franchisee at least a 30-day period in which to seek a prelimi-nary injunction before a third party has taken control of the premises, "[i]n order to prevent the development of competing equities." S.Rep. No. 731, *supra*, at 42, U.S.Code Cong. & Admin.News 1978, p. 900.

PMPA § 2804(b)(1) also expressly authorizes a franchisor that attempts a short-notice termination or nonrenewal, and thereby is forced to wait 30 days before establishing a new franchise, to "repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents." 15 U.S.C. § 2804(b)(1)(B)(ii). In discussing the preemptive effect of PMPA, however, the legislative history makes clear that "[i]t is not intended ... that this authorization should be construed as overriding State law prohibiting the operation of retail motor fuel marketing premises through employees or agents of a refiner." S.Rep. No. 731, *supra*, at 42, U.S.Code Cong. & Admin.News 1978, p. 901. Thus, local laws, such as D.C.Code § 10–212 (1981), which prohibit producers, refiners, and manufacturers of fuels from operating retail service stations, are not preempted, despite the fact that they may prohibit options that certain franchisors would otherwise have available when terminating or nonrenewing a franchise under PMPA. Such laws do not deal directly with terminations or nonrenewals, and their application does not undermine the purposes of PMPA.

## 2.

We next consider the RSSA provisions on which Davis relies. He first argued to the trial court that Gulf's nonrenewal notice failed to meet the standards set by D.C.Code § 10–223(b)(1), with the result that this violation requires a renewal of the franchise agreement pursuant to D.C.Code § 10–223(b)(3).[9] More specifically, § 10–223(b)(1) sets forth a 90-day notice requirement governing a franchisor's attempt to "terminate, cancel, or fail to renew" a franchise. Section 10–223(b)(3) specifies the remedy for a violation of this notice requirement: a one-year renewal. These provisions of RSSA are precisely the types of local law which PMPA § 2806(a) is designed to address. We hold that insofar as §§ 10–223(b)(1) and (b)(3) are not "the same as the applicable provision[s]" of PMPA, 15 U.S.C. § 2806(a), those sections of RSSA are preempted. The same reasoning that led us to reject Davis' asserted defenses under PMPA accordingly compels us to reject his arguments under RSSA §§ 10–223(b)(1) and (b)(3).

## 3.

The second RSSA provision on which Davis relies is D.C.Code § 10–221(a)(10) (1981) which provides, simply, that no franchise agreement shall "[b]e for a term of less than 1 year." Although, by establishing a one-year minimum lease term, this provision may have an effect on a franchisor's ability to use the 90-day nonrenewal provisions of PMPA, it does not attempt to regulate directly any aspect of franchise terminations or nonrenewals. Accordingly, PMPA § 2806(a) does not automatically preempt RSSA § 10–221(a)(10). *Accord Lasko*, 547 F.Supp. at 216–18 (Connecticut statute's three-year minimum lease term not preempted).[10] Ordinarily, therefore, absent an application of § 10–221(a)(10) that obstructs a purpose of PMPA, retail service station franchise agreements in this jurisdiction may not be for less than one year's duration. The question, therefore, is whether RSSA § 10–221(a)(10)—unlike RSSA §§ 10–223(b)(1) and (b)(3)—survives PMPA § 2806(a) so as to provide a defense to Gulf's action for possession.

Davis asserts that the ten-week lease extension was unlawful under § 10–221(a)(10) and thus should be construed as a one-year lease extension under one of two theories: (1) reformation of its terms by reference to the § 10–221(a)(10) one-year minimum, or (2) invalidation of the extension and thus conversion of the relationship to a tenancy at sufferance which, because of § 10–221(a)(10), becomes year-

9. D.C.Code § 10–223(b)(1) (1981) provides:

No retail dealer or distributor, except as otherwise provided in subsection (a) of this section, shall terminate, cancel, or fail to renew a marketing agreement unless he furnishes prior written notice to the other party. Such notice shall be sent to the other party by registered or certified mail not less than 90 days prior to the date on which the marketing agreement is to be terminated, cancelled, or not renewed, unless a shorter period is provided for in this subsection. Such notice shall contain a statement of the party's intention to terminate, cancel, or fail to renew the marketing agreement, the date on which such action shall become effective, and a statement of the specific grounds for such action. No distributor shall terminate, cancel, or fail to renew a marketing agreement, or notify a retail dealer of his intention to take such action, unless he reasonably and in good faith believes that the facts and circumstances existing do, in fact, justify his reliance on the grounds specified in his notice of intention to take such action. Notice furnished pursuant to this subsection shall be effective on the date of the mailing.

D.C.Code § 10–223(b)(3) provides:

The distributor's failure to furnish prior written notice, as required by this subsection, of his intention not to renew a marketing agreement, whether or not such marketing agreement provides for automatic extension or renewal, shall constitute a renewal of the marketing agreement for a term of 1 year from its stated expiration date.

10. *But see Drazin v. Amoco Oil Co.,* 1980–81 Trade Cas. (CCH) ¶ 63,604 (D.D.C.1980) (concluding without reciting the facts of the case and without analysis "that plaintiff [a franchisee] cannot sue for a preliminary injunction based on an alleged violation of D.C.Code § 10–221(a)" because that section of the RSSA is preempted by the PMPA).

to-year instead of month-to-month.[11] If we were to accept either argument, Davis would be deemed to have a lease running from January 1, 1983 to December 31, 1983, and thus have a valid defense to Gulf's action for possession.

If we were to read § 10–221(a)(10) to invalidate every retail service station lease extension that is shorter than one year, *but see Ferriola*, 496 F.Supp. at 162 (interpreting Pennsylvania's one-year minimum lease provision not to prohibit "temporary extensions during renewal negotiations"), we could not permit Davis to prevail here, even on the assumption that Gulf fraudulently induced Davis to settle for an unlawful, short-term extension. The appropriate remedy would be either to rescind the lease extension at the franchisee's instance and provide recovery for restitution and incidental losses, or to permit the franchisee to enforce the extension and recover for damages incurred as a result of the fran-

chisor's conduct. The lease extension could not, however, be specifically enforced as a one-year agreement on either a reformation or modified tenancy-at-sufferance theory.[12] Thus, although § 10–221(a)(10) may have provided Davis with a basis for invalidating the lease extension or for claiming damages against Gulf, it does not support his argument that the lease extension should have been construed against its plain language to extend the franchise agreement until December 31, 1983. Davis never presented the trial court with a claim for damages based on § 10–221(a)(10) and, on the facts of this case, such a claim would not have been cognizable by the Landlord and Tenant Branch. Super.Ct. L & T R. 5(b); *see Campos v. Aguila*, 464 A.2d 132, 133 (D.C.1983); *Brown v. Young*, 364 A.2d 1171, 1173 (D.C.1976).

We do not determine here whether RSSA § 10–221(a)(10) requires an automatic one-

**11.** Although Davis' argument to the trial court in opposition to Gulf's motion for summary judgment is far from a model of clarity, a review of the record reveals that both of the arguments addressed here were before the trial court at the time it granted summary judgment.

**12.** Although the RSSA explicitly authorizes civil actions and the imposition of a wide range of remedies for violations of a number of RSSA provisions, D.C.Code § 10–226(a) (1981), it does not expressly provide any remedy for a violation of § 10–221(a)(10). We are certain, nonetheless, that the legislature intended to permit franchisees to seek relief from franchisors' violations of § 10–221(a)(10); the only question is what remedies are appropriate. In addressing this question, we look to the remedies available under analogous common law claims.

One who has been induced by misrepresentations to enter into a contract ordinarily may choose between two remedies: he "may either rescind the contract and recover what he has parted with or affirm the contract and sue for damages caused by the fraud." *Hirshon v. Whelan*, 113 A.2d 484, 485 (D.C.1955); *see Mills v. Cosmopolitan Insurance Agency, Inc.*, 424 A.2d 43, 48 (D.C.1980); *see generally* 12 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 1523–26 (3d ed. 1970 & Supp.1984). Under certain limited circumstances, a third remedy is available: "An instrument will be reformed where one party is mistaken as to its *contents* and the other party has engaged in fraud or inequitable con-

duct." *Cafritz v. Cafritz*, 347 A.2d 267, 269 (D.C. 1975) (emphasis added). This equitable remedy of reformation is available only when the misrepresentation of one party misleads the other party as to the "contents or effect of a writing. If the misrepresentation relates to some other fact, ... reformation is not appropriate." RESTATEMENT (SECOND) OF CONTRACTS § 166 comment b (1981); *see, e.g., Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602, 609–10 (9th Cir.1977) (reformation remedy "will lie only if mistake, fraud or inequitable conduct infected the underlying negotiations, causing the written document to deviate from the true intent of the parties"); 12 S. WILLISTON, *supra*, at § 1525A ("if the contract agreed upon is embodied in the writing, the fact that the agreement was induced by fraud is not ground for reformation").

Given the sound policy reasons for ordinarily not allowing courts to rewrite the terms of a contract to which both parties knowingly assented, we conclude that the remedies available for a violation of § 10–221(a)(10), such as that alleged by Davis, should parallel those available at common law for misrepresentation. Only when a franchisor misleads a franchisee to believe that a franchise agreement provides for a one-year term, when in fact the contents of the writing provide for something less, will reformation be available. When, as here, the misrepresentation or bad faith pertains to something other than the contents or legal effect of the writing, the franchisee's remedies will be limited to rescission or damages.

year renewal of a retail service station lease if—before the lease expires—the franchisor says nothing to the franchisee, or negotiates an extension of less than one year, or attempts to nonrenew the franchise in a manner that violates PMPA. Nor need we address the difficult question whether such an application of § 10–221(a)(10) would obstruct the purposes of PMPA to such an extent as to require preemption. We hold only that when, as here, a franchisor does give the required notice of nonrenewal (here 90 days under PMPA) before the date on which a retail service station lease expires, and nonrenewal will not take effect until a date after the conclusion of the term, the resulting extension is, facially, a periodic tenancy [13] that cannot be reformed or otherwise deemed—and specifically enforced as—an automatic one-year lease renewal at the original expiration date. Accordingly, as a matter of law, an RSSA § 10–221(a)(10) defense was not available to Davis in Gulf's action for possession. Summary judgment here was appropriate.

### III. JUDGE GRAAE'S ORDER RELEASING PROTECTIVE ORDER PAYMENTS TO GULF

Davis also challenges Judge Graae's order, after a hearing,[14] releasing to Gulf payments which Davis had deposited in the court registry during the pendency of Gulf's action. The Landlord and Tenant Branch routinely orders such payments in possession cases in order to provide the landlord protection of his "fair compensation for the possession he loses during the period of litigation." *Cooks v. Fowler*, 148 U.S.App.D.C. 245, 250, 459 F.2d 1269, 1274 (1971); *see generally Davis v. Rental Associates, Inc.*, 456 A.2d 820, 823–24 (D.C. 1983) (en banc). Davis argues that PMPA,

RSSA, and the terms of Davis' service station lease all make clear that Gulf's obligations as a landlord were inexorably intertwined with its obligations to sell gasoline to Davis and to deliver it to the premises. It follows from this premise, Davis contends, that Gulf's obligation to supply him with gasoline continued as long as he lawfully remained in possession of the service station premises. Because Gulf stopped delivering gasoline to Davis' station as of March 10, 1983, and Davis could not thereafter operate as a branded Gulf retailer, Davis argues that he was subject to a "constructive eviction" and should not have been held liable for rent during the pendency of Gulf's action.

We agree with Davis' initial premise. Both PMPA and RSSA clearly recognize that there is a unique relationship between franchisors and franchisees in the petroleum industry. This relationship, which usually is built upon a combination of sales contracts and leases between the parties, imposes special duties on each party not to disrupt unnecessarily the business of the other.[15] Moreover, the service station lease in this case fixed Davis' rental payments according to the sale of gasoline between the parties (*see supra* note 1 and accompanying text) and provided that "the breach of any of the terms or conditions of [the gasoline sales] contract shall constitute a breach of this Lease." Similarly, the contracts for the sales and delivery of gasoline contain several references to Davis' status and obligations as a tenant under the service station lease. Davis is therefore correct in asserting that, during the course of the franchise relationship, Gulf's obligations to supply gasoline were not completely independent of its obligations as a landlord under the service station lease.

---

**13.** *See* RESTATEMENT OF THE LAW (SECOND) PROPERTY, LANDLORD AND TENANT § 1.5 (1977).

**14.** Judge Graae apparently held a hearing pursuant to *McNeal v. Habib*, 346 A.2d 508, 514 (D.C. 1975). We do not express an opinion as to whether such a hearing was necessary in the commercial context of this case, before the

court could issue an order releasing funds from the court registry.

**15.** *See generally* Comment, *Retail Gasoline Franchise Terminations and Nonrenewals Under Title I of the PMPA*, 1980 DUKE L.J. 522, 531 (PMPA "demonstrates congressional acceptance of the fiduciary model of franchising").

The question here, however, is whether Gulf had an obligation to continue delivering gasoline to Davis after it had done everything required by the franchise agreement and PMPA to cancel the service station lease and the contracts for sale and delivery of gasoline; *i.e.,* after Gulf effectively had nonrenewed the franchise relationship. Alternatively stated: did Davis retain a right to demand delivery of gasoline from Gulf after March 10, 1983, based not on the contract of sale or on Davis' possession of the premises under the lease, but instead based on the law of this jurisdiction which permits a tenant to retain possession after the expiration of a lease while the landlord attempts to regain possession through prescribed judicial procedures. *See Mendes v. Johnson,* 389 A.2d 781, 786–87 (D.C.1978) (en banc). Given our conclusion that Gulf had properly nonrenewed the franchise relationship effective March 10, 1983, this question does not involve any interpretation of the parties' rights or obligations under PMPA. We need consider only whether Gulf's refusal to deliver gasoline justified an abatement of Davis' rent under District of Columbia landlord and tenant law.

In *Mendes,* this court held that "the landlord's common law right of self-help has been abrogated, and the legislatively created remedies for reacquiring possession are exclusive. A tenant has a right not to have his or her possession interfered with except by lawful process." 389 A.2d at 787. Thus, when a tenant elects to hold over after the expiration of a lease to challenge the landlord's right to regain possession, the landlord may not take it upon himself to remove the tenant, either by physically evicting the tenant, *Mendes,* or by constructively evicting him. *Cf., e.g., Ackerhalt v. Smith,* 141 A.2d 187, 189 (D.C.1958) (constructive eviction may result when landlord refuses to make repairs and premises become untenantable).

Davis has not, however, called to our attention any case in which a landlord's refusal to carry on business dealings with a tenant has been held to constitute a constructive eviction. In the context of this commercial lease, and in light of our conclusion that Gulf did everything legally required to terminate its contract to supply Davis with gasoline, we conclude that Gulf's conduct did not amount to a constructive eviction and, accordingly, did not provide a basis for relieving Davis of his obligation to pay rent for the full period he remained in possession of the service station.

*Affirmed.*