**John Richard DEGE, Appellant,**

v.

**William Stacy MILFORD, Appellee.**

**No. 89–1178.**

District of Columbia Court of Appeals.

Argued March 28, 1990.
Decided May 10, 1990.

---

Lawrence J. Bernard, Jr., Washington, D.C., for appellant.

Mark London, for appellee.

Before TERRY, STEADMAN and SCHWELB, Associate Judges.

STEADMAN, Associate Judge:

This case, involving an issue apparently of nationwide first impression, stems from a dispute over rights in an Exxon gasoline service station franchise. Specifically, the issue is whether a right of first refusal in the franchise agreement is enforceable in light of the free transferability provisions of the District of Columbia Retail Service Station Act of 1976, D.C.Code §§ 10–201 to 242 (1989) ("the RSSA"). We hold that at least in the circumstances presented in this case, it is not.

I

Since 1978, under a series of franchise agreements, appellant Dege has operated a gasoline service station ("the station") owned by Exxon Company, U.S.A. ("Exxon") at 1545 Wisconsin Avenue in the Georgetown section of the District. Dege and Exxon entered into their most recent three-year agreement in June of 1988; under the agreement, Exxon granted Dege a leasehold interest in the station and agreed to sell to Dege the motor vehicle fuels necessary to operate the station.

The franchise agreement contemplated the possibility that Dege might decide to sell or otherwise transfer his interest in the station to a third party; that eventuality was governed by the terms of two "riders" included among the franchise agreement papers. These riders required Dege to notify Exxon of the terms of any proposed sale and to provide information about the business qualifications of the proposed buyer. Exxon could then either approve or disapprove the proposed sale. Additionally, Exxon reserved an "assignable right of first refusal"; under this provision, instead of either approving or disapproving the proposed buyer, Exxon could purchase Dege's interest "at the same price and on the same terms and conditions as are contained in the offer."

On January 18, 1989, Dege notified Exxon by letter of his intention to sell his franchise rights to Charles R. Shelton, Jr. ("Shelton"), the operator of a Chevron service station across the street from Dege's station.[1] Exxon responded by asking Dege

---

1. It is not argued that Shelton's operation of a competitor service station affects in any way the issues on this appeal.

to supply information about the terms of the proposed sale and Shelton's business qualifications, as required by the franchise agreement. In early April, Dege forwarded to Exxon a copy of his contract with Shelton for the sale of the franchise, for which Shelton agreed to pay $150,000. The Dege–Shelton contract, which anticipated closing on April 30, 1989, was conditioned upon Exxon's approval of the transfer.

After receiving the Dege–Shelton contract, Exxon approached appellee Milford, then employed as a manager at another Exxon station in the District, and told him that a service station franchise might be available in Northwest Washington. Milford had long expressed an interest in acquiring his own Exxon franchise. After inviting Milford to its offices to review the Dege–Shelton contract, Exxon assigned to Milford its right of first refusal. On April 27, 1989, Exxon notified Dege by letter of the assignment to Milford. That same day, Milford sent Dege a letter which stated: "As assignee of Exxon's Right of First Refusal, I hereby exercise this Right of First Refusal, and I shall purchase the franchise rights ... pursuant to the [Dege–

Shelton] contract." Milford deposited the $150,000 purchase price into an escrow account pending closing.

On May 3, 1989, Dege, acting through his lawyer, announced that he had "reconsidered" his decision to transfer his franchise to Shelton and would continue to operate the station himself. The letter suggested that as a result of this decision, the right of first refusal Milford sought to exercise was "no longer in force." [2] Shortly thereafter, Milford filed suit seeking to enforce his assigned right to purchase the station. After a bench trial, the court entered judgment for Milford and ruled that he was "entitled to specific performance to purchase all of [Dege's] rights and interests" in the station.

## II

### A

The District of Columbia Council enacted the Retail Service Station Act [3] in 1977 in an effort to stem anti-competitive developments in the marketing and distribution of automobile motor fuels. [4] The RSSA re-

---

**2.** The record does not reveal whether Shelton acquiesced in the apparent rescission of the contract. Nor does it indicate the cause of Dege's change of heart.

**3.** As a preliminary matter, Milford argues that Dege may not assert against him any defenses under the RSSA because he and Dege do not have a franchise relationship of the type the RSSA is designed to regulate. We conclude to the contrary, in light of the principle that an obligor may assert against a contract assignee defenses which he or she could have asserted against the assignor. *See Glassman Constr. Co. v. Fidelity and Casualty Co.,* 123 U.S.App.D.C. 1, 3 & n. 3, 356 F.2d 340, 342 & n. 3 ("an assignee 'takes the assignment subject to all defenses of the obligor against the assignor ... existing before notice of assignment'") (citing both Virginia law and general principles of contract law) (citation omitted), *cert. denied,* 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966). We also note that the position advanced by Milford would enable a franchisor to easily undermine the purposes of the RSSA. *Cf. Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 362 (4th Cir.1986) ("[a] franchisor cannot circumvent the protections the [comparable federal act] affords a franchisee by the simple expedient of assigning the franchisor's obligation to an assignee"). Mil-

ford's reliance on *Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d 1335 (11th Cir.), *cert. dismissed,* 474 U.S. 1039, 106 S.Ct. 609, 88 L.Ed.2d 586 (1985), is misplaced since the court in that case concluded that the initial relationship between the contracting parties was that of principal and agent, *id.* at 1341, and not, as here, franchisor and franchisee.

On the other hand, we hold that the motions judge correctly dismissed Dege's affirmative counterclaims against Milford, based on the RSSA and the comparable federal Petroleum Marketing Practices Act. *See infra* note 5. The provisions of these acts authorizing a cause of action allow such an action to be brought only against a "distributor," D.C.Code § 10–226(a), or "franchisor." 15 U.S.C. § 2805(a). Moreover, even though an obligor may raise against an assignee defenses which he or she could have raised against the assignor, the assignee "is not subject to affirmative liability on such a claim unless he contracts to assume such liability." RESTATEMENT (SECOND) OF CONTRACTS § 336 comment c (1981). Dege failed to join Exxon as a party, and his counterclaims therefore fail.

**4.** The District of Columbia Council Committee on Transportation and Environmental Affairs, the Committee to which several proposed service station regulation bills were referred, cited

flects the Council's belief that the existence of an economically vital group of independently operated service stations would counter these anti-competitive trends. *See* COMMITTEE REPORT, *supra* note 4, at 19–23. However, the "significant disparity in bargaining power" between oil company distributors and retail dealers, *id.* at 26, severely threatened the independence and even the viability of the District's independent service stations. This disparity enabled distributors to employ standard-form " 'Contract[s] of Adhesion' " and "to dictate the terms of a marketing agreement to their own best advantage while taking unfair advantage of the prospective retail dealers." *Id.* As a consequence, retail dealers were "generally denied the traditional prerogatives and protections afforded to independent businessmen." *Id.* Thus, one of the Council's objectives in adopting the RSSA was to rectify the imbalance between independent service station retailers and their franchisors. Specifically, the Council sought "to grant increased legal protection to retail dealers" and "to insure that distributors will treat retail dealers in an equitable manner." *Id.* at 28.

One of the many ways in which the RSSA enhances the legal and economic status of independent service station retailers

is to guarantee them the freedom to transfer their interest in a franchise.[5] Thus, D.C.Code § 10–221 provides in pertinent part:

(a) All marketing agreements shall be in writing and shall be subject to the nonwaiverable conditions set forth in this section, whether or not such conditions are expressly set forth in such marketing agreements.... No marketing agreement shall:

. . . .

(5) Prohibit a retail dealer from selling, assigning, or otherwise transferring his marketing agreement or any interest therein to another person;

. . . .

(9) Contain any provision which requires the retail dealer to assent to any release, assignment, novation, waiver, or estoppel which ... would negate any rights granted to a retail dealer by this subchapter; [or]

. . . .

(11) Contain any term or condition which, directly or indirectly, violates this subchapter.

The only statutorily permitted restriction on the franchisee's right to transfer inter vivos his or her interest in the franchise [6]

three major anti-competitive trends in the marketing and distribution of auto fuels:

I. an increase in the downstream integration of refiners into marketing;
II. an increased emphasis on low margin/high volume retail service stations; and
III. a reduction in the total number of retail service stations.

REPORT OF THE COMMITTEE ON TRANSPORTATION AND ENVIRONMENTAL AFFAIRS, COUNCIL OF THE DISTRICT OF COLUMBIA, ON BILL NO. 1–333, THE "RETAIL SERVICE STATION ACT OF 1976", AND BILL NO. 1–39, THE "RETAIL SERVICE STATION ACT" 7 (1976) (hereinafter "COMMITTEE REPORT"). The Committee predicted that these trends, if unchecked, would "have severe detrimental impacts upon competition in the motor fuel marketing industry and upon the availability of and retail prices for motor fuels, petroleum products, automotive products, and motor vehicle maintenance and repair services." *Id.*

5. The RSSA also sought to enhance the status of independent retail operators by prohibiting distributors from terminating or refusing to renew franchise agreements without good cause. *See* D.C.Code § 10–223(c). However, the termination and non-renewal provisions of the RSSA

have been preempted by a somewhat comparable federal statute, the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841 (1988) (the "PMPA"). *See Davis v. Gulf Oil Corp.*, 485 A.2d 160, 169 (D.C.1984). Like the termination provisions of the RSSA, the PMPA's termination provisions endeavor to "protect automotive service station franchisees 'from arbitrary or discriminatory termination or non-renewal of their franchises.' " *Id.* at 164 (quoting S.REP. NO. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 873, 874).

6. A subsection 10–225(f) was added to the RSSA some seven years after the original enactment. This subsection provides that in the event of a retail dealer's death or retirement, a distributor shall grant "a 1–year trial marketing agreement" to a designated successor, who must be a family member but who in turn may assign the trial agreement pursuant to the provisions of the RSSA. D.C.Code §§ 10–225(f)(1), (3). The Council adopted this subsection to amend D.C. Code § 10–223(c)(3), which permitted a distributor to terminate a franchise agreement in the event of the death of the retail dealer or the dissolution of the operating entity, and D.C.

appears in D.C.Code § 10–225. That provision enables the distributor to disapprove a proposed franchise transfer if the distributor, after reviewing information about the prospective transferee's qualifications to operate the franchise, can establish that its refusal to approve the prospective transfer is reasonable.[7] Apart from this specific qualified limitation, the RSSA provides to the retailer a readily transferable right in his or her franchise.[8] Further, the RSSA prohibits the franchisor from including provisions in the marketing agreement that *indirectly* violate the terms of the RSSA. D.C.Code § 10–221(a)(11).

### B

Despite the prevalence of legislation affecting gasoline and other franchise agreements, no case is cited to us, and we have found none, dealing with the issue presented to us. We therefore are guided solely by the RSSA itself. Because the RSSA seeks to effectuate broad remedial purposes, its provisions must be liberally construed in favor of the independent retailers. *See* D.C.Code § 10–241 (provisions of the RSSA "shall be liberally construed in order to effectively carry out the purposes of this chapter"); *see also McCree v. McCree*, 464 A.2d 922, 928 (D.C.1983) (courts should liberally construe remedial statutes in order to effectuate the purposes for which they were enacted); *Hutchinson Bros. Excavation Co. v. District of Columbia*, 278 A.2d 318, 321 (D.C.1971) (same).

In our view, Exxon's right of first refusal in this case effectively functions as a statutorily impermissible restraint on the freedom granted to Dege by D.C.Code § 10–221(a)(5) to transfer his interest in the station "to another person." The right of first refusal here "indirectly" violates the RSSA's transferability provisions. D.C. Code § 10–221(a)(11). As a general matter, a right of first refusal may have some effect on alienability. *See* C. ROSENFIELD, THE LAW OF FRANCHISING § 119, at 201 (1970) (a right of first refusal in the franchisor "may work a detriment to the franchisee for, like all first refusal options, it makes the outside purchaser wary of negotiating only to find the company will exercise its option"); *cf.* Annotation, *Pre-emptive Rights to Realty as Violation of Rule Against Perpetuities or Rule Concerning Restraints on Alienation*, 40 A.L.R.3d

Code § 10–223(c)(4), which permitted termination in the event the retail dealer voluntarily abandoned his or her service station. *See* REPORT OF THE COMMITTEE ON TRANSPORTATION AND ENVIRONMENTAL AFFAIRS, COUNCIL OF THE DISTRICT OF COLUMBIA ON BILL No. 5–12, THE "SUCCESSOR IN INTEREST TO A GASOLINE PRODUCTS MARKETING AGREEMENT ACT OF 1983," at 2 (1983). The legislative history to subsection 10–225(f) provides no indication that the successor in interest provision was in any way intended to limit or affect the assignability right. The termination provisions of the RSSA are, of course, preempted by the federal PMPA. *See supra* note 5.

7. D.C.Code § 10–225, in pertinent part, provides:

    (a) No *distributor shall* unreasonably withhold his approval of any sale, assignment, or other transfer, including any transfer of the retail dealer's right, privilege, or authority to occupy a retail service station pursuant to a marketing agreement, of a marketing agreement or any interest therein to another person by a retail dealer.

    (b) No retail dealer shall sell, assign, or otherwise transfer a marketing agreement or any interest therein unless he furnishes prior written notice to the distributor of his intention to make such sale, assignment, or other transfer. Such notice shall be sent to the distributor by registered or certified mail and shall include the prospective transferee's name and address, a statement of the prospective transferee's financial qualifications, a statement of the prospective transferee's business experience during the previous 5 years, and a statement of the prospective transferee's ability, character, and credit history.

    (c) The distributor shall either approve or disapprove such sale, assignment, or other transfer in writing within 60 days after receipt of the notice specified in subsection (b) of this section. A distributor's failure to notify the retail dealer of his approval or disapproval shall be construed as an approval of the proposed sale, assignment, or other transfer.

8. The preempted termination provisions of the RSSA expressly forbid a distributor to terminate or refuse to renew any marketing agreement because of "[t]he retail dealer's attempt to exercise his right to sell, assign, or otherwise transfer his marketing agreement or any interest therein to another person...." D.C.Code § 10–223(e)(1)(D).

920, 943 (1971) ("[b]y its very nature a pre-emptive right interferes with alienation to some extent").[9] Given the manner in which Dege desired to transfer his interest in the station in this case, however, the right of first refusal has proven particularly intrusive. As demonstrated by his subsequent efforts to rescind the Dege–Shelton agreement, when Dege learned that he could not transfer the station to Shelton, but instead must do so to Milford, he apparently decided that he would prefer not to sell the station at all.[10] Milford's exercise of the Exxon right of first refusal would frustrate Dege's freedom to make this choice.

The argument is made that once Dege decided to sell his franchise, it should have been a matter of indifference to him to whom he sold and that any protection as a franchisee under the RSSA should no longer be relevant. The right to transfer granted by the RSSA, however, is given in broad terms; the right encompasses "selling, assigning, or otherwise transferring." D.C.Code § 10–221(a)(5). Thus, for example, no consideration is required; the transfer may be gratuitous, such as to a spouse or child, or it may be undertaken for tax or other reasons. An element of a right of transferability is the right to decide whether and to whom to transfer. The right of

first refusal incorporated into the franchise agreement here to a significant extent effectively shifts that right to Exxon, once the franchise holder has decided to transfer to any other person.[11] Such a result is, we think, inconsistent with the interrelated provisions of the RSSA governing the transferability of the franchise.[12]

Our conclusion that the right of first refusal provision indirectly violates the proscription against prohibitions on a retailer's right to transfer his or her franchise interest is somewhat buttressed by the fact that the riders containing the right of first refusal directly and explicitly replaced earlier provisions in the franchise agreement which flatly prohibited Dege from transferring any part of his interest in the Exxon franchise. Those blanket prohibitions, of course, were rendered void by D.C.Code § 10–221(a)(5).

Under the circumstances of this case,[13] and in light of our obligation to construe the RSSA liberally in favor of franchisees, we conclude that the Exxon right of first refusal here "indirectly ... violates" the proscription against franchise agreement conditions which prevent an independent retailer from "transferring his marketing agreement ... to another person." D.C. Code §§ 10–221(a)(5), (11).[14]

9. Although a right of first refusal of the type at issue here would presumably not violate common law contract principles, *see Beavers Service, Inc. v. Norris*, 470 A.2d 312, 315 (D.C.1983), or constitute an unreasonable restraint on alienation, *see* RESTATEMENT (SECOND) OF PROPERTY § 4.4 (1983), we must decide this case in the context of a non-waivable, statutorily created right of alienability.

10. The right to transfer to Shelton, of course, was subject to Exxon's power to reasonably withhold approval of a transfer to an unfit transferee. *See* D.C.Code §§ 10–225(a)–(c).

11. Strictly read, the right of first refusal is activated whenever the retail dealer receives a bona fide offer, even before he or she accepts to form a binding contract. The provision states:

[Franchisee] shall not assign or sell such [franchise] interest unless [Franchisee] shall have first received a separate written bona fide offer from a third party to purchase such interest and shall have notified Exxon in writing of the party or parties making the same, and the selling price, terms and conditions

thereof, and shall have attached thereto a complete executed copy of said offer.... Exxon or its assignee shall thereupon have the right to purchase [Franchisee's] interest at the same price and on the same terms and conditions as are contained in the offer.

12. For example, rather than justify the reasonableness of its refusal to consent to a transfer, Exxon could simply exercise its right of first refusal and assign it to Exxon's chosen assignee.

13. We deal here only with this situation where the right of first refusal is part of the form agreement and where the franchisee has elected not to sell rather than to sell to one other than the original prospective buyer. We do not reach other possible scenarios, such as where a franchisee makes a general solicitation for buyers or where the right of first refusal is separately negotiated for fresh consideration.

14. Because we conclude that the assigned right of first refusal upon which Milford predicates his claim is invalid under the RSSA, we need not consider Dege's defenses based on the PMPA.

Accordingly, the order granting Milford specific performance of the right of first refusal is reversed and the dismissal of Dege's counterclaims is affirmed.

*So ordered.*