Richard FRANKARD and Janice M. Frankard, Plaintiffs-Appellants,

v.

AMOCO OIL COMPANY, f/k/a The American Oil Company, a Maryland corporation, Defendant-Respondent.

Court of Appeals

*No. 83–210. Argued September 30, 1983.—*
*Decided November 9, 1983.*
(Also reported in 342 N.W.2d 247.)

For the plaintiffs-appellants there were briefs by *Dennis P. Moroney* of *McMahon & Moroney,* of counsel to *Eugene Koenen,* of Milwaukee, and letter briefs and oral argument by *Michael J. Cramer* of *Steve Enich Law Office,* of Milwaukee.

For the defendant-respondent there were briefs by *Stuart Parsons* and *Jeffrey Morris* of *Quarles & Brady,* of Milwaukee, and *Paula J. Clayton,* of counsel, of Chicago, and oral argument by *Stuart Parsons,* of Milwaukee.

Before Scott, C.J., Brown, P.J., and Voss, J.

BROWN, P.J. Richard and Janice Frankard, owners of a service station in Mequon, appeal from a directed verdict holding that there was no credible evidence to support their claim for economic duress against their franchisor, Amoco Oil Company. The trial court noted that a threat made to another is an insufficient ground for recovery if the threatening party has a legal right to do what it has threatened to do. Because the trial court could find no evidence disputing Amoco's claim that it had a legal right to threaten cancellation of a lease, it directed verdict for Amoco. We do not agree with the trial court's finding and reverse that part. We affirm other issues of lesser importance.

The Frankards built a carwash and service station on their land. On September 9, 1971, they signed a lease and leaseback agreement with Amoco. The lease agreement rented the Frankard property to Amoco. Amoco agreed to pay rent of one and three-quarters cents (1.75¢) per gallon of gasoline it delivered to the property. For each gallon over 300,000 gallons, Amoco agreed to pay two cents (2¢) to the Frankards.

The leaseback gave the Frankards the right to operate the service station for Amoco. They agreed to subrent the property and equipment from Amoco for an additional one-half of a cent (.5¢) per gallon of gasoline that Amoco delivered to the station. The leaseback authorized the Frankards to use the Amoco trademark.

The terms of both the lease and the leaseback were for one year beginning October 1, 1971. They both provided for automatic renewal of not more than fourteen one-year periods. The lease required Amoco to give a thirty-day notice to the Frankards for nonrenewal. The leaseback required the Frankards to give a thirty-day notice to Amoco for nonrenewal.

The lease agreement, leasing the Frankards' premises to Amoco, was changed twice, each time resulting in

lower rental payments to the Frankards. These changes are the subject of the lawsuit.

First, in 1978, Amoco adjusted its rental payments downward by one-quarter of a cent (.25¢) per gallon. Although the Frankards signed an agreement consenting to the change, they later claimed they were fraudulently induced to sign because Amoco promised to provide a mansard roof for the station if the Frankards agreed to the rent reduction.[1] Amoco did not build the mansard roof. Later, the Frankards had a gabled roof constructed at their own expense.

Second, in 1979, Amoco adjusted the rent downward another one-half of a cent (.5¢) per gallon. On this occasion, an Amoco representative visiting the service station told the Frankards that the October 1, 1979 lease renewal would be contingent upon their agreement to a further rent reduction. At one point in the discussion, the representative said that if the Frankards did not agree, Amoco would "cut them off." The Frankards signed. It is important to note that the Amoco representative's visit occurred less than ninety days from the renewal date. The Frankards claim the representative's threat to cancel was wrongful and that they signed the agreement under the duress of the threat.

As damages for the 1978 fraud cause of action, the Frankards demanded: (1) $20,000, this sum representing the difference between the gabled roof actually built and the mansard roof allegedly promised by Amoco, and (2) the difference between the 1977 rent and the lower 1978 rent. This claim was based on the grounds that they would not have signed the 1978 contract but for Amoco's fraudulent inducement. As to the first claim, the trial

[1] A mansard roof is one having two slopes on all sides with the lower slope steeper than the upper one. It looks much like those seen on the vast majority of America's barns. *See* Webster's New Collegiate Dictionary (1977).

court granted summary judgment to Amoco, reasoning that uncontroverted evidence showed the Frankards intended to put on a new roof anyway and, in fact, did build a new roof without relying on Amoco's promise. As to the second claim, the trial court granted a directed verdict for Amoco, finding that the evidence was insufficient for jury consideration.

The trial court also directed verdict for Amoco on the alleged 1979 economic duress claim holding there was no credible evidence of a wrongful threat. We will discuss this issue first.

To receive compensation for economic duress, the alleging party must show that he or she has been the victim of a wrongful or unlawful act or threat. *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109, 293 N.W.2d 155, 160 (1980). A threat is an insufficient ground for recovery if the person has a legal right to perform the threat. *Id.* at 110, 293 N.W.2d at 160. The Frankards argue that Amoco's representative had no right to threaten cancellation. They make this claim, in part, because the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–06 (1982), prohibits cancellation of leases between petroleum franchisors and franchisees unless a ninety-day notice is first given. The Frankards conclude that since the threat to cancel took place less than ninety days from the renewal date, it was made without legal force. Therefore, the Frankards claim the case should have gone to the jury to decide whether they were coerced into signing the agreement because of this wrongful threat.

The trial court, during the motion for directed verdict, gave short shrift to the PMPA notification requirement. It held that the Act applied only to franchise agreements where the refiner-distributor agrees to lend its trademark and provide its petroleum to service station operators—the leaseback in this case. The trial court rea-

soned that Amoco threatened to cancel only the property rental agreement—the lease agreement here. The trial court concluded that this was merely a landlord-tenant dispute, unconnected with franchise law such as the PMPA.

Amoco's appellate brief was written in support of the trial court's analysis. At oral argument, however, Amoco also argued that the PMPA should not be read to require a notice of cancellation at least ninety days before the nonrenewal date but rather at any time, regardless of the renewal date.[2] Thus, Amoco argued that nonrenewal is effective ninety days after notice is given, regardless of the starting date of the contractual year. By illustration, a notice of cancellation in late July becomes effective in late October even if October 1 is the renewal date.[3] Amoco concludes that its threat was legal and directed verdict was proper.

We first deal with whether the lease agreement comes under the PMPA. The PMPA, effective June 19, 1978, protects franchisees from arbitrary or discriminatory termination of their franchises for failure to comply with the marketing policies of a franchisor. *Kostantas v. Exxon Co., U.S.A.,* 663 F.2d 605, 606 (5th Cir. 1981), *cert. denied,* 456 U.S. 1009 (1982). It contains a general prohibition against termination or nonrenewal of franchises unless the action is based on grounds specified in the legislation and certain notice requirements are fol-

---

[2] Amoco never objected to the Frankards' use of the PMPA at trial. Any question, if there ever was a question, of whether the PMPA was properly before the trial court is waived. We note that Amoco received notice five days before the hearing that the Frankards intended to bring the PMPA to the trial court's attention as proof that Amoco's threat was wrongful.

[3] We are not certain that Amoco abandoned the contention, as stated in its brief, that the PMPA does not affect leases of land. It chose not to address the contention at oral argument. We assume, however, that no abandonment took place.

lowed. 123 Cong. Rec. 10,384 (1977). It preempts state laws dealing with termination and nonrenewal which conflict with the PMPA. *Id.* at 10,383.

The PMPA applies retroactively to all franchises operational on or after the effective date of June 19, 1978. *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1224 (7th Cir. 1982). It is undisputed that the lease agreement, signed in 1971, was operational on and after the PMPA's effective date.

The PMPA defines a "franchise" as any contract under which a refiner or distributor authorizes a retailer to use its trademark. 15 U.S.C. § 2801(1)(A). It is undisputed that the Frankard-Amoco leaseback is a franchise contract under the definition. Section 7 of the leaseback authorized the Frankards' use of the Amoco trademark. The question remains, however, whether the lease agreement, the document amended by Amoco's rent decreases, also falls under the PMPA or under landlord-tenant law as the trial court held.

■

We find that the lease agreement is controlled by the PMPA. Historically, a common form of arrangement for the operation of a service station has included a lease of the premises to a company which, in turn, licenses the lessor to operate the station. Annot., 126 A.L.R. 1375, 1375–76 (1940); *see also* Annot., 83 A.L.R. 1416 (1933). This is the type of arrangement the Frankards and Amoco agreed upon through the lease agreement and the leaseback.

■

Cases analyzing this arrangement indicate that the lease of the premises to the company and the agreement for the lessors to operate the station are construed together if executed on the same day. *Shell Oil Co. v. Stiffler,* 48 P.2d 503, 506 (Utah 1935); *Ratcliffe v. Union Oil Co. of California,* 77 P.2d 136, 140 (Or. 1938).

They are also construed together if they refer to the same subject, exist to effectuate the same purpose and are part of the same transaction. *Hunt v. Shell Oil Co.,* 116 F.2d 598, 601 (10th Cir. 1941). *See also Standard Oil Co. v. O'Hare,* 252 N.W. 398, 400 (Neb. 1934).

The Frankard-Amoco lease agreement and leaseback meet these conditions. They were executed on the same day, refer to the same subject, exist to effectuate the same purpose and are between the same parties. We also note the specific reference of section 16 of the leaseback to the underlying lease. In our view, this also indicates that both agreements are part of the same transaction. *See Hunt* at 601.[4]

We hold that the lease and the leaseback together are subject to PMPA proscription when the agreements are between the same two parties, refer to each other, are executed at the same time and only by being read to-

---

[4] Upon conclusion of oral argument, this court requested Amoco to present any cases, by memorandum letter, which would hold that the lease should not be construed together with the leaseback so as to be part of the PMPA. Amoco sent us a list of cases which it claimed authorized treating the lease and leaseback separately as the trial court did. These cases, which we set at the end of this footnote, are not applicable here. All of these cases involved someone other than the operators as owners of the property, which is not the type of lease-leaseback arrangement discussed in *Stiffler, Ratcliffe, O'Hare* or *Hunt.* They did not involve subparts of a whole agreement between two parties. We decline to attach any weight to them. The cases sent by counsel are:

1. *Hifai v. Shell Oil Co.,* 704 F.2d 1425 (9th Cir. 1983).

2. *Veracka v. Shell Oil Co.,* No. 80–533–S (D. Mass. Nov. 26, 1980) and 655 F.2d 445 (1st Cir. 1981).

3. *Brungardt v. Amoco Oil Co.,* 530 F. Supp. 744 (D. Kan. 1982).

4. *Gaspar v. Chevron Oil Co.,* 490 F. Supp. 971 (D. N.J. 1980).

5. *Sachi v. Mobil Oil Corp.,* 1980–1 Trade Cases, ¶ 63,044 (E.D.

6. *Bernardini v. Exxon Corp.,* 1981–1 Trade Cases, ¶ 63,921 (E.D. Pa. 1981).

gether effectuate the intent of the parties. This holding comports with common sense. It would be incredibly easy, otherwise, for a franchisor in a lease-leaseback situation to evade the time limit requirement of the PMPA by drafting a lease agreement providing a shorter period than ninety days for notice of nonrenewal. The effect would be to make franchisees vulnerable to a threat of cancellation on the eve of a contract's renewal date, the very antithesis of what a ninety-day period was designed to cure. Ninety days allows franchisees sufficient time to seek other distributors so that business will continue uninterrupted. *See* S. Rep. No. 731, 95th Cong., 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Ad. News 873.

Next, we discuss whether the PMPA ninety-day provision may be given at any time irrespective of the renewal date. We reject Amoco's proposed construction that nonrenewal becomes effective ninety days after the notice regardless of the renewal date. We agree with the Frankards' assertion that Amoco had to give ninety-day notice prior to the renewal date of October 1, and the July 30 notice did not meet this requirement.

The plain language of the Petroleum Marketing Practices Act, 15 U.S.C. § 2804(a)(2) requires that notification of nonrenewal must be furnished to the franchisee not less than ninety days prior to the date the nonrenewal takes effect. The definitive case on this issue is *Lasko v. Consumers Petroleum of Connecticut, Inc.*, 547 F. Supp. 211 (D. Conn. 1981). The court, in holding that a nonrenewal may be effectuated only at the end of a term, found that a September 9, 1980 notice of nonrenewal given by Consumers Petroleum for a franchise with a renewal date of September 30, 1980 failed as notice under the PMPA's ninety-day requirement. *Id.* at 220–21.

Amoco cites *Sachi v. Mobil Oil Corp.*, 1980–1 Trade Cases, ¶ 63,044 (E.D. N.Y. 1979), as authority for the opposite conclusion. We disagree, as *Sachi* is readily distinguishable. Sachi's franchise agreement called for a specific option date by which the franchisor had to elect whether to renew. Mobil's notice was six months in advance of the renewal date but was less than ninety days in advance of the option date specified in the agreement. The court held that the Act only requires "notice ninety days prior to the date at which termination or nonrenewal *takes effect*." *Id.* at 77,195. That the notice was given six months before the nonrenewal took effect was the only controlling consideration, not the option date. *Sachi* more accurately supports the Frankards than Amoco.[5]

It is undisputed that Amoco's alleged "threat" of nonrenewal, delivered by its representative, was given less than ninety days prior to the end of the term. If cancellation took place, it would have been illegal under the PMPA. Since Amoco did not have a legal right to cancel, the threat to cancel was wrongful under the doctrine of economic duress. The jury should be left with the question of whether the Frankards were coerced into signing because of the wrongful threat.[6]

---

[5] Amoco also cites *Bernardini v. Exxon Corp.*, 1981–1 Trade Cases, ¶ 63,921 (E.D. Pa. 1981), with facts similar to *Sachi*. For the same reason that we rejected *Sachi* as inapplicable, we reject this case.

[6] Our research uncovered two cases holding that where a franchise agreement is entered into prior to the PMPA, a franchisor should not be required to strictly comply with the PMPA notification requirements where unforeseen events rendered compliance "unreasonable." Without going into great detail, it is sufficient for us to make plain that Amoco has never argued this, either to the trial court or this court on briefs or oral argument. We deem the argument waived. We also have grave doubts about its applicability to the facts in this case.

We next discuss the 1978 agreement which the Frankards claim they were fraudulently induced to sign. The Frankards assert they signed the amendment only because Amoco promised to provide a mansard roof.

As compensation, the Frankards sought the difference in rent for that year in relation to the previous year. They also sought $20,000, representing the difference between the mansard roof they were promised and the gabled roof they eventually had constructed. We hold that the trial court correctly granted partial summary judgment respecting the Frankards' $20,000 claim. It was clear that the Frankards did not renovate the roof in reliance upon Amoco's promise. The Frankards admitted building the more expensive gabled roof because it had less potential water problems than the mansard design. In fact, during oral argument, the Frankards' counsel conceded that partial summary judgment was proper.

The same cannot be said about the Frankards' claim for the difference between the rent which would have been paid to the Frankards under the pre-1978 arrangement and the rent paid by Amoco as a result of the 1978 reduced rent agreement. The Frankards claim that because of the promise for the new roof, they signed the contract. They claim fraud in the inducement. They testified to this at trial. The trial court erred in taking this issue from the jury and granting directed verdict. On remand, the jury should decide whether the Frankards were fraudulently induced to sign the 1978 contract. If the jury rules in the affirmative, the Frankards, although not entitled to $20,000 for the new roof, would be entitled to the $993 difference in rental payments.

All of the Frankards' other issues are meritless except for one. We will treat them in summary fashion.

The trial court denied the Frankards' motion to compel two depositions of Illinois residents in Milwaukee and to compel production of documents. The standard of review for discovery decisions is whether the trial court abused its discretion in ordering or prohibiting discovery. *Vincent & Vincent, Inc. v. Spacek,* 102 Wis. 2d 266, 270, 306 N.W.2d 85, 87 (Ct. App. 1981). The Frankards have given us no indication that this discretion was exercised arbitrarily. No prejudice is claimed or shown. That ends the matter.

The Frankards wanted to take testimony of other service station franchisees as evidence of past untruthfulness by Amoco's representatives. The Frankards argued the testimony was necessary to show a lack of credibility among certain Amoco employees and also to show Amoco's "habit" under sec. 904.06, Stats.[7] Because there was no proper offer of proof, we cannot tell the relevancy of the testimony or the alleged prejudice the Frankards incurred by the trial court's ruling. Absent an offer of proof, we are precluded from reviewing the alleged error. Sec. 901.03 (1) (b), Stats.; *Findorff v. Findorff,* 3 Wis. 2d 215, 226, 88 N.W.2d 327, 333 (1958).

Finally, the Frankards were precluded from introducing testimony, expert and otherwise, concerning Amoco's wealth for the purpose of punitive damages. The trial

---

[7] Section 904.06, Stats., states:

Habit; routine practice. (1) Admissibility. Except as provided in s. 972.11(2), evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

(2) Method of Proof. Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.

court held that because no evidence of economic duress was present, no evidence of wealth could be presented. The trial court never really ruled on the question. That issue is not ripe for determination here. It is more properly the trial court's on remand.

*By the Court.*—Judgment and order affirmed in part; reversed in part and remanded.