IMARK INDUSTRIES, INC., Plaintiff-Respondent and Cross-Appellant,†

v.

ARTHUR YOUNG & COMPANY, Defendant and Third-Party Plaintiff-Appellant and Cross-Respondent,

Joel B. KONICEK and David H. James, Third-Party Defendants-Respondents and Cross-Appellants.†

Court of Appeals

*No. 86–1125. Submitted on briefs April 7, 1987.—Decided August 25, 1987.*
(Also reported in 414 N.W.2d 57.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

116

For the plaintiff-respondent and cross-appellant the cause was submitted on the briefs of *John P. Scotellaro* and *Stephen J. O'Neil* of *Bell, Boyd & Lloyd,* of Chicago, Illinois and *Andrew O. Riteris* of *Michael, Best & Friedrich,* of counsel, of Milwaukee.

For the defendant and third-party plaintiff-appellant and cross-respondent the cause was submitted on the briefs of *Whyte & Hirschboeck, S.C.,* by *D. Jeffrey Hirschberg, Barbara Janazsek* and *Ruthann M. Riedl,* of Milwaukee and *Eugene R. Erbstoesser,* associate general counsel, of New York, New York.

For the third-party defendants, respondents and cross-appellants the cause was submitted on the briefs of *Smith & O'Neil, S.C.* by *Alan M. Levy,* of Milwaukee.

On behalf of Wisconsin Institute of Certified Public Accountants an amicus curiae brief was filed by *Foley & Lardner* with *John S. Skilton* and *William M. Conley* of counsel, of Madison.

On behalf of American Institute of Certified Public Accountants an amicus curiae brief was filed by *L. William Staudenmaier* of *Cook & Franke* of Milwaukee with *Willkie Farr & Gallagher* by *Kenneth*

*J. Bialkin, Louis A. Craco* and *Deborah E. Cooper* of counsel, New York, New York.

Before Moser, P.J., Wedemeyer and Sullivan, JJ.

MOSER, P.J. The central issue in this case involves the liability of an accounting firm for the negligent preparation of an audit report relied on by a third party not in privity. Arthur Young & Company (AY) appeals from a judgment affirming a jury verdict finding that AY negligently misrepresented the financial status of National Control Systems, Inc. (NCS) in an audit AY prepared for NCS which was relied on by Imark Industries, Inc. (Imark), and awarding Imark $425,800 in damages. Imark cross-appeals arguing that the trial court erred in its award of prejudgment interest. In addition, Joel B. Konicek (Konicek) and David H. James (James), NCS's president and vice-president, cross-appeal that part of the judgment awarding AY $106,450 in damages based on their intentional misrepresentations to AY, contending that the jury verdict is inconsistent and incomplete.

NCS was a Milwaukee company which manufactured and installed sophisticated computerized security and energy management systems. In April 1981, NCS decided to replace its present auditors, a small Racine firm, with a "big eight" public accounting firm to lend an air of increased credibility to its financial statements so that it could raise additional capital investments. NCS hired AY to perform a review of NCS's financial statements for the nine months ending May 31, 1981, and an audit of its financial statements for the year ending August 31, 1981. At the same time, NCS hired the investment banking firm of Dain Bosworth (DB) to solicit venture capital investors.

In December 1981, DB contacted Imark concerning investing in NCS. At this time, Imark was looking to invest the money it had received from the sale of its meat packing business in a high technology company. DB gave Imark a "Private Placement Memorandum," which included AY's report reviewing the interim nine months financial statements of NCS. This report showed that NCS had a profit of $48,000 and a positive shareholders' equity of $315,000 as of August 31, 1981. In addition, the audited financial statements reflected that NCS's projects were eighty-five percent complete as of August 31, 1981. A footnote in the audit stated that AY had reviewed and revised NCS's estimated earnings from contracts for 1980 and 1981 and that "[t]he effect of changes in estimates was to decrease 1981 net results from operations by approximately $390,000."[1]

In addition, Imark received a report prepared by Page Whitmore, an independent consultant, which evaluated and reported on NCS's business, markets, competition and management as of September 1981.

---

[1]At issue are the following paragraphs from footnote 2 of the report:

2. *Changes in estimates and litigation settlement*

Revisions in estimated earnings from contracts are made in the year in which circumstances requiring revision become known. During 1981, revisions to estimates were required with respect to certain contracts entered into in 1980, to design, build, and install custom systems. These contracts were undertaken with the objective of developing standardized products to provide the base for future sales. Certain of these contracts resulted in losses when completed in 1981.

The effect of changes in estimates was to decrease 1981 net results from operations by approximately $390,000 from that which would have been reported had the determination of 1980 earned revenue been based on the final outcome of these contracts.

Because Imark was interested in investing in NCS, DB set up a meeting between Imark and NCS for December 15, 1981.

At this first meeting, NCS explained some of its projects and passed out some promotional materials. Imark requested additional information from NCS. Sometime later in December, NCS gave Imark its annual president's letter to NCS's shareholders and NCS's audited financial statements for the fiscal year ending August 31, 1981. The president's letter stated in part that "[a]s of August 31, 1981, our backlog was in excess of $2,000,000. ... Our projected sales for fiscal 1982 of $4,500,000 should be attainable."

A second meeting was held between Imark, NCS and DB on January 6, 1982. At this meeting, NCS disclosed that it had lost several hundred thousand dollars since August 31, 1981. Despite this, the terms of a possible acquisition of fifty percent of NCS's stock for $950,000 were discussed.

On January 27, Imark and NCS met again to discuss the terms of the proposed deal. NCS acknowledged that first quarter losses of fiscal 1982 were $276,000, and stated that another $222,000 in losses were expected. Imark requested NCS's first quarter 1982 financial statements. According to NCS, losses totaling between $700,000 and $750,000 were expected for the six months ending February 28, 1982. Despite these losses, Imark now wanted to not only buy fifty-five percent of NCS's stock for $1,000,000, but also loan NCS $410,000.

On January 28, Imark received NCS's unaudited first quarter financial statements which confirmed that as of November 30, 1981, NCS had lost at least $490,000. Despite these losses, Imark executed an agreement to purchase fifty-five percent of NCS's

outstanding shares for $1,000,000 and to provide NCS with an interim loan of $410,000. While the closing of the deal was set for mid-March, Imark made the first installment of $150,000 on the loan on January 29. On February 5, Imark made the second installment of $100,000 on the loan, and one week later the third and final installment of $160,000 was paid.

The Imark board approved the deal on January 30. Assuming a "worst case scenario" of a six-month loss of $676,000 (which included the $276,000 unaudited first quarter loss and a $400,000 "worst case plug figure" for the second quarter), Imark determined that NCS would remain a viable entity after Imark made its investment. At the meeting to close the deal on March 19, however, NCS tendered its unaudited financial statements for the period ending February 28, 1982, which showed a six-month loss of $1,235,000. Since Imark had anticipated losses of only $676,000, it refused to close the deal, and demanded that NCS repay the $410,000 it had loaned to NCS. In October 1982, NCS went bankrupt without repaying any portion of Imark's loan.

Imark sued AY for negligent misrepresentation based on AY's audit of NCS's 1981 financial statements. In its complaint, Imark alleged that AY negligently performed its review of the interim financial statements and its audit of the year-end financial statements, and in doing so, failed to uncover the grossly understated estimated expenditures necessary to complete the projects and the concomitant overstated revenues and gross profits. Imark alleged that it had relied on NCS's financial statements, as audited by AY, in making its decision to invest in and loan money to NCS. AY later filed a third-party complaint against Konicek and James of NCS for fraud after AY

discovered that they had misrepresented facts and withheld documents from AY's auditors so NCS's financial statements would "look good."

Following trial, the jury found that AY was liable to Imark for $425,800 in damages because of the negligent misrepresentations made in its opinion letter or the financial statements which Imark had relied on. The jury found AY seventy-five percent negligent, Konicek ten percent negligent, James ten percent negligent, and Charles Zaar (Zaar), NCS's comptroller at the time of the audit who was not a party to the suit, five percent negligent. On AY's third-party fraud claim, the jury found that Konicek, James and Zaar intentionally made material misrepresentations of fact to AY as to the information provided during the audit, and that AY justifiably relied on these misrepresentations. Judgment was entered in favor of AY against Konicek and James in the amount of $106,450.

On appeal, AY argues that: (1) the trial court erred in refusing to (a) instruct the jury, and (b) include in the special verdict form, that in a negligent misrepresentation case, the plaintiff (Imark) must prove justifiable reliance; (2) the trial court made erroneous discovery and trial rulings based on its misreading of *Citizens State Bank v. Timm, Schmidt & Co.;*[2] (3) Imark is barred from recovery because its reliance was unjustifiable and unreasonable as a matter of law based on Imark's failure to conduct a proper inquiry after receiving notice that AY's representations may be incorrect; (4) public policy under *Timm* precludes AY from being held liable in this case; (5) the reasoning in *Timm* is flawed, and there-

[2]113 Wis. 2d 376, 335 N.W.2d 361 (1983).

fore the case should be overruled; (6) the trial court erroneously awarded Imark prejudgment interest; and (7) under *Fleming v. Threshermen's Mutual Insurance Co.*,[3] which was decided after judgment was entered in this case, and public policy, AY as a negligent tortfeasor is relieved of liability because Imark provided the intentional tortfeasors with covenants not to sue, or in the alternative, the negligent tortfeasor can only be held liable for its proportionate share.

Imark cross-appeals arguing that it was entitled to recover prejudgment interest from the date of the loss at market interest rates. Finally, Konicek and James cross-appeal arguing that because the jury verdict is inconsistent and incomplete, there must be a new trial on all issues.

We affirm the trial court's decision on all but two issues. First, based on our supreme court's recent decision in *Fleming,* we conclude that full liability for Imark's damages should be assessed against Konicek and James based on their intentional misrepresentations, thus freeing AY of any liability. In addition, we conclude that the trial court erred in awarding prejudgment interest.

## PREAMBLE LAW

We begin by noting that the court of appeals and the trial court are bound by the precedents established by the supreme court of this state.[4] Two such Wisconsin supreme court precedents govern several of the issues raised in this appeal. First, *Timm,* ad-

---

[3]131 Wis. 2d 123, 388 N.W.2d 908 (1986).

[4]*Larsen v. Wisconsin Power & Light Co.,* 120 Wis. 2d 508, 519, 355 N.W.2d 557, 563 (Ct. App. 1984).

dressed the issue of whether an accountant could be held liable for the negligent preparation of an audit report to a third party not in privity who relies on the report.[5] In analyzing the extent of an accountant's liability to injured third parties, the court looked at the Restatement (Second) of Torts sec. 552 (1977) (hereinafter Restatement).[6] The court noted that under the Restatement, liability is not extended to all parties whom the accountant might reasonably foresee as using the information. Instead, the Restatement's "formulation of a 'limited group of persons' extends causes of action to a limited number of third parties who are expected to gain access to the finan-

---

[5]*Timm,* 113 Wis. 2d at 377, 335 N.W.2d at 362.

[6]Restatement sec. 552 reads as follows:

**Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

cial statement information in an expected transaction.[7]

The court in *Timm* refused to adopt the Restatement's limitation of liability to certain third parties because it was too restrictive a statement of policy factors.[8] The court concluded that under fundamental principles of Wisconsin negligence law, public accountants may be held liable to third parties not in privity for the foreseeable injuries resulting from their negligent acts, unless recovery is denied on grounds of public policy.[9] According to the court, the following public policy factors limit the imposition of liability despite a finding of negligence causing injury:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appeals [sic] too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.[10]

Second, in *Fleming,* the court held that a negligent tortfeasor has a right to indemnity from an

---

[7]*Timm,* 113 Wis. 2d at 385, 335 N.W.2d at 365.
[8]*Id.* at 386, 335 N.W.2d at 366.
[9]*Id.*
[10]*Id.* at 386–87, 335 N.W.2d at 366.

intentional joint tortfeasor.[11] The court reasoned that while this approach allows a defendant who is causally negligent to escape from liability in some circumstances, shifting the full responsibility for the loss to the intentional tortfeasor serves the policy of deterring conduct which society considers to be substantially more egregious than negligence.[12] In addition, the court held that *Pierringer* principles[13] apply to actions for indemnity as well as actions for contribution.[14]

## JUSTIFIABLE RELIANCE

Imark sued AY for misrepresentation based on AY's audit of NCS's 1981 financial statements. In Wisconsin, there are three classes of actionable misrepresentation. A cause of action for misrepresentation can be based on intent, negligence, or strict responsibility.[15] On this review, several questions concerning the application of the doctrine of negligent misrepresentation are presented.

AY first argues that because justifiable reliance is an element of Imark's case for misrepresentation, the trial court erred in refusing to instruct the jury and

---

[11]*Fleming,* 131 Wis. 2d at 130, 388 N.W.2d at 911.

[12]*Id.*

[13]*Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963). A *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to nonsettling defendants, and to bar subsequent contribution actions the nonsettling defendants might assert against the settling defendants. *Id.* at 193, 124 N.W.2d at 112.

[14]*Fleming,* 131 Wis. 2d at 131, 388 N.W.2d at 911.

[15]*Ollerman v. O'Rourke Co.,* 94 Wis. 2d 17, 24, 288 N.W.2d 95, 99 (1980).

127

include in the special verdict Imark's burden of proving justifiable reliance. According to AY, whether Imark's reliance was "reasonable and justifiable" should have been included in special verdict form. In addition, AY contends that the standard jury instruction, Wis JI—Civil 2403, should have been modified (as indicated by underscoring) to read as follows:

> Fourthly, that Imark <u>reasonably</u> believed such representation to be true and <u>justifiably</u> relied thereon to its damage. The question is whether the representation actually misled Imark and materially affected its conduct. In determining whether or not Imark actually relied upon the representation, the test is whether or not it would have acted in the absence of the representation. It is not necessary that such reliance was the sole and only motive inducing it to enter into the transaction. If the representations was [sic] relied upon and constituted a material inducement, that is sufficient. <u>However, one cannot justifiably rely on a representation the falsity of which could have been discovered with ordinary care, especially where the relying party possesses adequate information to create a duty of inquiry into the truth of the representation. Failure to conduct such an inquiry after acquiring information that is a warning, renders any reliance unreasonable and unjustified.</u>

AY contends that the trial court's decision to exclude the requested language on justifiable reliance was based on its misreading of *Timm's* language about third parties who may rely on financial statements, and its erroneous belief that reliance was included in the comparative negligence issue. We disagree.

 A trial court has discretion in framing a special verdict, which we will not disturb if the material issues of fact in the case are addressed.[16] Similarly, the framing of the jury instructions lies within the trial court's discretion.[17] This discretion applies to both the choice of language and emphasis in the instructions. Discretion should be exercised so that the jury is fully and fairly informed of the applicable rules of law and assisted in making a reasonable analysis of the evidence.[18]

 If the instructions given by a trial court adequately cover the law applicable to a case, this court will not find error in its refusal to give another instruction even though the other instruction was not erroneous.[19] Moreover, any error in an instruction must generally result in prejudice to the complaining party to justify overturning a verdict and judgment.[20] The test to be applied in determining whether the error is prejudicial is the probability, and not the mere possibility, that the jury was misled by it.[21]

---

[16]*Maci v. State Farm Fire & Casualty Co.,* 105 Wis. 2d 710, 719, 314 N.W.2d 914, 919 (Ct. App. 1981).

[17]*Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 448, 280 N.W.2d 156, 162 (1979).

[18]*State v. Vick,* 104 Wis. 2d 678, 690, 312 N.W.2d 489, 495 (1981).

[19]*State v. Kemp,* 106 Wis. 2d 697, 706, 318 N.W.2d 13, 18 (1982).

[20]*In re E.B. v. State,* 109 Wis. 2d 1, 8, 325 N.W.2d 64, 68 (Ct. App. 1982), *rev'd on other grounds,* 111 Wis. 2d 175, 330 N.W.2d 584 (1983).

[21]*Lutz v. Shelby Mut. Ins. Co.,* 70 Wis. 2d 743, 751, 235 N.W.2d 426, 431 (1975).

AY's entire argument on this issue is based on its conclusion that justifiable or reasonable reliance has long been an essential element of the tort of misrepresentation. However, this is only a partially correct statement of the law in that it fails to differentiate between the three categories of misrepresentation recognized in Wisconsin.[22] In analyzing the elements of the three causes of action for misrepresentation, it becomes clear that while justifiable reliance is an element of intentional misrepresentation and strict responsibility, it is not a separate element of negligent misrepresentation.[23] All of the authorities cited by AY to support its position on this issue involve causes of action for either intentional misrepresentation or strict liability, and therefore are inapplicable to this case.[24]

Based on the above, we conclude that since "justifiable" reliance is not an element of a cause of action for negligent misrepresentation, the trial court was correct in not adding such language to both the jury instruction and the special verdict. The instructions and special verdict formulated by the trial court correctly encompassed the law applicable to this case.

[22]*See Whipp v. Iverson,* 43 Wis. 2d 166, 169–70, 168 N.W.2d 201, 203–04 (1969) for a description of the elements of these three torts.

[23]*Compare* element five of both Wis JI—Civil 2401 on intentional misrepresentation and Wis JI—Civil 2402 on strict responsibility for misrepresentation with element four of Wis JI—Civil 2403 on negligent misrepresentation.

[24]For example, AY cites *Kiefer v. Fred Howe Motors, Inc.,* 39 Wis. 2d 20, 26–29, 158 N.W.2d 288, 291–93 (1968) (a fraudulent representation case); *Miranovitz v. Gee,* 163 Wis. 246, 256, 157 N.W. 790, 793–94 (1916) (a strict liability case).

AY next argues that the trial court's erroneous discovery and evidentiary rulings prejudiced its reliance defense and "culminated in instructions which removed the justifiable reliance issue from the jury's consideration." The standard of review for discovery decisions is whether the trial court abused its discretion in ordering or prohibiting discovery.[25] Similarly, the standard of review of evidentiary rulings is also whether there was an abuse of discretion.[26]

Specifically, AY sought to discover evidence regarding Imark's past investment practices and its business acumen and sophistication. While the trial court limited AY's discovery in this area, AY was allowed considerable latitude in inquiring into and introducing evidence concerning Imark's sophistication, experience and expertise. Therefore, the trial court did not abuse its discretion on this issue.

In addition, AY attempted to introduce evidence showing that in 1981 various investors turned down NCS because of negative information. The trial court refused to admit this testimony on the grounds that it was cumulative, irrelevant and hearsay. The trial court also excluded testimony and documentary evidence from Imark's own auditors relating to the "businessman's review" service the firm offered which Imark had turned down. According to AY, this proof was critical since it described the services and ways which Imark's auditors could help "find the worms in the woodwork" before the decision to invest was made.

[25]*Frankard v. Amoco Oil Co.*, 116 Wis. 2d 254, 267, 342 N.W.2d 247, 253 (Ct. App. 1983).

[26]*Featherly v. Continental Ins. Co.*, 73 Wis. 2d 273, 283, 243 N.W.2d 806, 814 (1976).

The trial court excluded this evidence, concluding that the materials were not probative because they were merely "marketing" brochures.

We conclude that the trial court's rulings to exclude this evidence did not constitute an abuse of discretion. AY's own expert testified regarding NCS's failure to attract other potential investors. In addition, a representative of Imark testified that Imark did not ask its own auditors to do a businessman's review and that Imark had never seen the brochures. Therefore, the trial court was correct in excluding this evidence as irrelevant and cumulative.

Finally, AY argues that because Imark is a professional investment corporation with considerable sophistication and abilities, it could not have justifiably relied on the 1981 financial statements as a matter of law. Therefore, reversal is warranted. At a minimum, AY argues, the facts of this case demonstrate that Imark had a duty to inquire and conduct a thorough investigation of NCS's financial condition which, if not properly fulfilled, rendered Imark's reliance unjustifiable as a matter of law.

However, as previously discussed, justifiable reliance is not an element of negligent misrepresentation. In addition, the cases AY relies on to support its argument that Imark had a duty of inquiry are not applicable to this case.[27] Imark's reliance on the financial statements was appropriately considered by

---

[27]AY relies on *FDIC v. Lesselyoung,* 476 F. Supp. 938, 946–47 (E.D. Wis. 1979), *aff'd sub nom. FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir. 1980) (involving fraudulent misrepresentation); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 531 (7th Cir. 1985) (applying Illinois law).

the jury. We will not disturb the jury's finding on this issue on appeal.

## *TIMM'S* PUBLIC POLICY FACTORS

In *Timm,* our supreme court listed six public policy reasons for not imposing liability despite a finding of negligence causing injury.[28] AY now contends that two of these public policy reasons—the injury is too remote from the negligence, and allowing recovery would enter a field with no sensible or just stopping point—should be applied to preclude the imposition of liability in this case.[29] We disagree.

AY first argues that Imark's injury is too remote to impose liability. According to AY, the passage of time and related events between August 31, 1981, when NCS's fiscal year ended, and January/February 1982, when Imark made the loans, was too great to make a sound investment decision without obtaining more current audited financial statements. This argument, however, overlooks the fact that the audit report was released on October 23, 1981, only three months before the first loan installment was paid on January 29, 1982. We agree with the trial court's conclusion that the injury in this case is not too remote from the negligence to preclude liability.

---

[28]*Timm,* 113 Wis. 2d at 386–87, 335 N.W.2d at 366.

[29]In its brief, AY argues that all six of the public policy reasons listed in *Timm* apply. AY is joined on this issue by two *amicus curiae* briefs filed by the Wisconsin and the American Institutes of Certified Public Accountants. However, since only two public policy arguments were raised at the trial court level, our discussion on this issue is therefore limited. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443–44, 287 N.W.2d 140, 145 (1980).

AY also contends that it should be relieved of liability because allowance of recovery would enter a field that has no sensible or just stopping point. According to AY, it is "mere chance" that Imark was the only investor in this case. "Others may have chosen to put in $10 million or more. Unknown to and unexpected by AY, innumerable persons could have obtained a chance to sue it [AY] for millions of dollars. Such unlimited potential liability to a multitude of entirely unknown plaintiffs is frightening."

AY argues that the very nature of an auditor's function results in a "unique coalescence of disproportionality, unreasonable burden, and lack of any just or sensible stopping point, when, as here, the third party is neither a known nor intended user." Thus, AY asks this court to fashion a reasonable limit on an auditor's boundless exposure to unknown third parties by using a sensible application of *Timm*'s public policy analysis.

In *Timm,* the court noted that "[a]rguably, the primary intended user for most reviewed financial statements is a third party."[30] It was this class of third parties that *Timm* sought to protect. We agree with Imark that the unknown third-party users of a company's audited financial statements are not so numerous and indeterminate as AY suggests.

In this case there was evidence that AY knew the general purposes behind NCS's request for an audit. Imark's expert testified that one reason for an audit is that companies cannot seek financial aid from banking institutions or from venture capitalists without one. He further testified that AY could foresee that NCS would use the audit to induce investment capital,

---

[30]*Timm,* 113 Wis. 2d at 384 n. 10, 335 N.W.2d at 365 n. 10.

and that a venture capitalist like Imark would rely on AY's audit in making any kind of investment decision.

We also note that there is testimony in the record, albeit contested, that AY had actual knowledge that NCS's purpose in seeking the audit from AY was to secure investment capital. Shortly after the selection of AY as the auditor of NCS, Dr. John Howard, a director of NCS, talked with a representative of AY that he had previously known. Howard testified that he told the AY representative of the renowned respect the investment community had for AY, and further that this would bode well for NCS when investors saw the audit.

Therefore, we conclude that Imark's receipt of the audited financial statements, and its reliance and use of the statements in its decision to invest, were reasonably foreseeable. Because this foreseeability provides a logical and just limit to an accountant's liability, the trial court was correct in rejecting AY's public policy argument on this issue.

## *TIMM* REASONING FLAWED

AY contends that the *Timm* decision does not adequately take into consideration the realities of either an auditor's role or American commercial enterprise. Citing the "major deterioration in the availability of accountant's insurance" since *Timm* was decided, and the effect the insurance crisis has had on accountants, AY argues that our supreme court's reasoning in *Timm* is flawed and based on unsupported rationales. While AY argues for a change

in the law of accountant liability, we are bound by prior decisions of the supreme court.[31]

## INTENTIONAL TORTFEASORS

AY next argues that because the jury found that Konicek, James and Zaar had each intentionally misrepresented the financial status of NCS to AY, and that AY had justifiably relied on these statements in preparing Imark's audit, under the indemnity doctrines not only were NCS's principals liable for the damages to AY, but they also were directly liable to Imark. Thus AY was relieved of any liability to Imark for its own negligent misrepresentations of NCS's financial condition in its certified audit. Accordingly, AY contends that the trial court erred in granting judgment in favor of Imark against AY for damages for negligent misrepresentations in the amount of $410,000 and only allowing the jury's finding of $106,450 in damages to AY for NCS's principals' intentional misrepresentations, and claims that the principals of NCS owe Imark directly for all of Imark's losses. We agree.

Our supreme court has recently held in *Fleming* that a negligent tortfeasor has a right to indemnity from an intentional joint tortfeasor.[32] The court further concluded that a *Pierringer* release of an intentional joint tortfeasor operates to absolve a negligent tortfeasor of liability to a plaintiff because the negligent tortfeasor's right to indemnity from the intentional joint tortfeasor becomes a right to indemnity from the plaintiff.[33]

---

[31]*Larsen,* 120 Wis. 2d at 519, 355 N.W.2d at 563.

[32]*Fleming,* 131 Wis. 2d at 125, 388 N.W.2d at 909.

[33]*Id.*

Although in this case Imark executed covenants not to sue with Konicek and James, we perceive of no different result whether the release of the intentional tortfeasor is obtained by a *Pierringer* release or, as here, a covenant not to sue. While such releases or covenants not to sue prevent the plaintiff from suing a later discovered intentional tortfeasor, it does not prevent a negligently misrepresenting defendant, not a party to the releases or covenants not to sue, from maintaining a third-party action against the intentional tortfeasors. If the negligent misrepresenter prevails against the intentional misrepresenter the plaintiff in such instance only has recourse to recover against the intentional tortfeasor. It follows therefore that the trial court erred in granting judgment to AY for indemnification for only $106,450 against Konicek and James. We therefore reverse that part of the judgment and remand this matter to the trial court to enable it to grant judgment to Imark for the full amount of its losses against these intentional tortfeasors even though it allows AY, who is a causally negligent tortfeasor to escape from liability.[34]

## PREJUDGMENT INTEREST

Finally, AY appeals the trial court's award of prejudgment interest on the jury verdict, pursuant to sec. 138.04, Stats. Based on our conclusion that AY is relieved of liability in this case, the preverdict interest issue no longer applies to AY.[35] However, because the

---

[34]*Id.* at 130, 388 N.W.2d at 911.

[35]In its argument on this issue, AY contended that the trial court erred in awarding prejudgment interest in a case involving multiple defendants. While AY is correct that the presence of multiple defendants precludes a court from awarding preverdict

award of interest still applies to Konicek and James, the issue of whether the trial court erred in awarding prejudgment interest must still be addressed.

Preverdict interest is recoverable only on damages that are either liquidated or liquidable. In order to recover interest there must be a fixed and determinate amount which could have been tendered and interest thereby stopped.[36]

In this case, the $410,000 due on the note was a liquidated amount readily ascertainable which could have been tendered at any time to stop the interest. However, as AY points out, preverdict interest is prohibited in cases where the existence of multiple

---

interest, on the issue of negligent misrepresentation there was only one defendant—AY. We note that the trial court erred when it included not only Imark and AY, but also Konicek, James and Zaar, the intentional tortfeasors, in the comparison of negligence question in part one of the special verdict. While Wisconsin was one of the first states to allow contribution between negligent tortfeasors, it has not allowed the comparison of the actions of a negligent tortfeasor with those of an intentional tortfeasor because there can be no contribution for damages in these situations. *Fleming,* 131 Wis. 2d at 129–30, 388 N.W.2d at 910–11. The trial court did not err in allowing the comparison of negligence between AY and Imark, but it did err in including the names of NCS's principals in that same comparison of negligence question. However, this error was harmless because the jury did not find Imark contributorily negligent in any percentage. Therefore, all comparative causal harm to Imark for negligent misrepresentation would have rested on the shoulders of AY but for the jury's finding of intentional misrepresentations on the part of NCS's principals in part two of the special verdict.

[36]*Johnson v. Pearson Agri-Systems, Inc.,* 119 Wis. 2d 766, 771, 350 N.W.2d 127, 130 (1984).

defendants prevents any single defendant from knowing prior to trial the precise amount of his ultimate liability.[37] In applying this rule, it becomes clear that the trial court erred in awarding preverdict interest in this case.

Because the trial court erred in awarding prejudgment interest, we need not address Imark's cross-appeal issues regarding the amount of interest awarded and when the interest began to accrue.

## CROSS-APPEAL

Finally, Konicek and James cross-appeal arguing that the special verdict, as rendered by the jury, is inconsistent, contrary to the law, and incomplete. We disagree.

Konicek and James contend the verdict is inconsistent because the jury found that AY, through its audit, negligently misrepresented the financial conditions of NCS, and because the jury also found that AY relied on the claimed fraudulent statements made by Konicek, James and Zaar. This argument was laid to rest by our supreme court when it stated that a negligent tortfeasor, such as AY, has a right to indemnity from an intentional joint tortfeasor, for if this policy were not in place, intentional tortfeasors such as Konicek, James and Zaar would not be deterred from conduct which society considers to be substantially more egregious than negligence.[38]

Here, even though there was conflicting evidence, the jury found that Konicek, James and Zaar defraud-

[37]*See id.* at 781, 350 N.W.2d at 135.

[38]*Fleming,* 131 Wis. 2d at 130, 388 N.W.2d at 911.

139

ed AY by intentionally concealing invoices due on its general accounts as well as invoices for materials and work on certain job-book accounts. These invoices were concealed in the desk of an NCS employee. This employee testified that she was told by both James and Konicek that these invoices should be held in her desk drawer until the audit was over because the accounts payable had to be kept down and the accounts receivable kept up so that investors would come into the company. The jury's verdict therefore was not inconsistent when it found that AY negligently misrepresented NCS's financial condition, and that AY relied on the false representations made by Konicek, James and Zaar.

Based on the above, we need not address the incomplete verdict issue as Konicek and James are liable directly to Imark for their intentional misrepresentations and AY is released of its liability for negligent misrepresentations.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with directions.